**Andrea D. WILKES, David H. Ehrenwerth and Charles K. Clark, as trustees of the Mark E. and Myrna L. Mason Irrevocable Trust, Mark E. Mason and Myrna L. Mason, Appellants,**

v.

**PHOENIX HOME LIFE MUTUAL INSURANCE COMPANY, a corporate, and Balanced Equities, Inc., a corporation, Appellees.**

Superior Court of Pennsylvania.

Argued Sept. 17, 2003.

Filed May 26, 2004.

David L. McClenanhan, Pittsburgh, for appellants.

Jeffrey G. Weil, Philadelphia, for Phoenix Home, appellees.

Before: FORD ELLIOTT, TODD, and TAMILIA, JJ.

TODD, J.

¶ 1 Appellants Andrea D. Wilkes, David H. Ehrenwerth, and Charles K. Clark, trustees of the Mark E. and Myrna L.

206 ■

Mason Irrevocable Trust (the "Trust"), and Mark E. and Myrna L. Mason appeal from the order of the Allegheny County Court of Common Pleas granting summary judgment in favor of Appellee Phoenix Home Life Mutual Insurance Company ("Phoenix"). We reverse, and remand.

¶ 2 The facts and procedural history of this case may be summarized as follows. In the late 1980's, the Masons, who were then in their fifties, created an insurance trust to purchase and hold a $7 million insurance policy whose proceeds would enable the Masons' children to pay estate taxes without having to invade the illiquid corpus of the Masons' estate. The Trust named as trustees the Masons' oldest daughter, Andrea Wilkes, the Mason's lawyer, David Ehrenwerth, Esquire, and their accountant, Charles Clark (collectively, the "Trustees"). The Masons and the Trustees were seeking a policy whose out-of-pocket premium payments would cease by the time Mr. Mason retired, when the Masons would have less income available to fund premium payments, and that would avoid subjecting Myrna Mason to the financial burden of out-of-pocket premium payments in the event her husband predeceased her. To meet the Masons' needs, Phoenix's insurance agent Sander Lenenberg, with whom the Masons had been acquainted since the late 1970's, proposed that the Trustees purchase a Phoenix whole life second-to-die policy called "Survivorship Life Protector" ("SLP"), with a rider known as "Optionterm."[1] This type of policy was promoted by Phoenix on a "quick pay," "rapid pay," or "vanishing premium" basis, and contemplated that, after a specified number of premium payments, dividends and paid-up additions generated by the policy would be sufficient

to make the policy self-sustaining so that no additional out-of-pocket payments would be due from the insured. The specific SLP policy proposed by Lenenberg for the Masons provided a targeted death benefit of $7 million on the death of the second-to-die, consisting of approximately $4.1 million of whole life insurance and $2.9 million of Optionterm. Under his proposal, which provided for a vanishing premium over time, the base premium for the coverage was to be $80,813 per year for the first five years of the policy, $60,813 per year beginning the sixth year and continuing until the tenth year, $40,813 per year from the tenth year until the fifteenth year, and finally to zero beginning in the sixteenth year of the policy (2004), and staying at zero thereafter. To support his proposal, Lenenberg provided the Masons and the Trustees with illustrations generated by Phoenix showing the out-of-pocket premium payments reducing to zero in 2004, and staying there. According to the Masons and the Trustees, these illustrations did not indicate that the death of one insured would have any impact on the premiums. Based on Lenenberg's proposal, the Trustees purchased the SLP policy in 1989 and began making the agreed-upon premium payments.

¶ 3 In January 1994, the Trustees received an annual premium notice indicating that the premium for the sixth year would be $80,813.23 rather than the decreased amount of $60,813. In light of this discrepancy, Trustee Ehrenwerth wrote to Phoenix on January 28, 1994 and asked them to confirm that the premium due was $60,813, and otherwise confirm that the policy remained in full force and effect. In response, Phoenix sent the Trustees a new

1. The difference between Optionterm and the whole life component of the SLP insurance policy was that Optionterm was annual term insurance. Term insurance tends to be the most inexpensive form of life insurance when a person is young and the risk of death is low, but can become prohibitively expensive as a person ages.

illustration which showed the total out-of-pocket payment required declining more slowly than shown in the original illustration and not vanishing until the 23rd year of the policy. After the Trustees contacted Lenenberg about this inconsistency, and Lenenberg inquired of Phoenix, Phoenix ran a new set of illustrations on April 29, 1994 in which the out-of-pocket premium payment schedule conformed to the original 1989 illustration, with premium payments declining and vanishing entirely in the sixteenth year of the policy. No death scenario was included in these illustrations. Phoenix ran another set of illustrations in June 1994 which were provided to Trustee Ehrenwerth and the Masons, again confirming the original premium schedule, but again also omitting a death scenario.

¶ 4 In January 1995, after receiving the policy anniversary statement, a lawyer for the trust reviewed the policy with Lenenberg and requested him to provide an updated projection for the policy that assumed dividends reduced by one and two percentage points. In February 1995, Phoenix ran seven illustrations showing a variety of scenarios with respect to premium schedules and dividend reductions, none of which showed a death scenario. In February and March 1996, Phoenix ran additional illustrations to determine what would happen if the Masons varied their out-of-pocket payments for a few years. Here again, no death scenarios were shown.

¶ 5 Appellants claim that while they were being led to believe the original premium schedule would be in effect regardless of which death scenario was employed, internally, Phoenix was setting its rates on the Mason's policy to reflect the dramatic change in actuarial status when one of the Masons died. According to those rates, which Appellants claim Phoenix never disclosed to them, under certain probable scenarios in which Mark Mason predeceased Myrna Mason, out-of-pocket premiums which had previously vanished would reappear and quickly escalate to hundreds of thousands of dollars per year.

¶ 6 In August or September 1996, the Trustees received notice of a proposed settlement of a nationwide class action brought in New York state court against Phoenix, *Michels v. Phoenix Home Life Mutual Ins. Co.*, Index No. 5318–95 (N.Y. Sup.Ct. Albany Cty.1995). The class action notice described the allegations made in the *Michels* action as follows:

> The Plaintiffs make allegations concerning (i) how Phoenix made use of a method of using dividends to pay premiums on a whole life policy, or interest credited on a universal life policy, rather than paying them in cash, in order that no further out-of-pocket premium would be due after a fixed period of time, which sales concept was variously referred to as "Quick Pay" or "Rapid Pay," as well as Phoenix's use of dividends to help meet the costs of a rider known as Optionterm; (ii) the sale of life insurance by portraying it as an investment, savings, retirement or other similar plan without disclosing that it is life insurance or the nature of the policy's benefits; (iii) the replacement of any existing life insurance policy with a new life insurance policy, or the sale of a new life insurance policy funded in whole or in part using an existing policy's cash value; and (iv) the failure to disclose material information in connection with the introduction of new methods for calculating dividends and crediting rates. The allegations in the lawsuits include claims that Phoenix misled policyowners in these and other circumstances.

(Notice of *Michels* Class Action, August 1996, at 2 (R.R. at 1528a).)[2] The class action notice indicated that those who remained in the class and had whole life policies would be eligible to receive "General Policy Relief," consisting of dividend enhancements for up to four years and, if they had an Optionterm rider, they could receive "Optionterm Offset" which was a two-year offset of the out-of-pocket outlay required to maintain Optionterm coverage.

¶7 After the Masons and the Trustees received notice of the class action and proposed settlement, they consulted with Lenenberg whom they claim reassured them on behalf of Phoenix that their policy was not affected and advised them they should not opt out of the class action.[3] The Masons and the Trustees ultimately chose not to opt out, and the opt-out phase ended on October 18, 1996. In the months that followed, Phoenix continued to provide the Trustees with policy illustrations which depicted the policy coverage as originally represented. In January and again in March 1997, for instance, Phoenix generated and provided to the Masons via Lenenberg illustrations confirming, with minor variations, the basic out-of-pocket premium payments and death benefit terms of the policy as originally represented in 1989.

¶8 In mid-April 1997, the Trustees received a notice indicating that class members had 45 days, or until May 27, 1997, to accept General Policy Relief or, if they believed they could provide evidence of misrepresentation, invoke the alternative dispute resolution ("ADR") process. After they received this notice, the Trustees and the Masons once again turned to Lenenberg for his advice. According to Trustee Ehrenwerth and Mr. Mason, Lenenberg told them not to invoke ADR because their policy was not affected.

¶9 Unbeknownst to the Trustees and the Masons, on April 25, 1997, Phoenix generated another set of illustrations for the Masons' policy which showed Mr. Mason dying in year 21 at age 80. In that illustration, the out-of-pocket premium vanished after the 13th year, but then returned in the 24th year when Mrs. Mason would be 78, and quickly escalated until it reached $630,774 for the 41st year. This illustration was never provided to the Masons or the Trustees.[4]

¶10 In August 1998, Mr. Mason learned for the first time that the FBI was investigating Lenenberg for fraud, which included Lenenberg diverting to himself substantial premiums that Mason had paid for insurance with another insurance company. Upon learning this, the Trustees wrote directly to Phoenix and requested

2. The Questions and Answer Brochure that accompanied the class action settlement notice similarly described the lawsuit as involving, *inter alia,* Phoenix's alleged misrepresentations concerning its vanishing premiums program:

> **What claims were made against Phoenix in this lawsuit?**
> The lawsuit makes several claims about how certain types of policies were sold. Broadly, the lawsuit alleges misrepresentations involving sales practice claims, including the use of dividends to reduce out-of-pocket cash premiums.... Specifically, the lawsuit made four such claims:

1. How the company sold vanishing premium policies, which Phoenix called "Quick Pay" or "Rapid Pay" policies. Vanishing premium is a sales concept under which policy values, rather than out-of-pocket payments, are used to pay premiums on whole life policies....

(Question and Answer Brochure, August 1996, at 1 (R.R. at 323a).)

3. In his deposition, Lenenberg denied ever having advised either the Masons or the Trustees not to opt out of the class action.

4. Lenenberg claimed in his deposition that he did not receive this illustration either.

Phoenix to send directly to them, and not through Lenenberg, a complete history of all transactions concerning the policy from its inception. On March 12, 1999, after some prompting from the Trustees, Phoenix sent Trustee Ehrenwerth a letter with 110 pages of attached illustrations. All of the illustrations included the dividend enhancement benefit provided under the class action settlement. In one of the illustrations, which had Mr. Mason dying first at age 83 (year 24 of the policy), out-of-pocket premiums would return in year 27 of the policy when Mrs. Mason was 81 and quickly escalate to astronomical levels, resulting in Mrs. Mason having to pay over $5 million in out-of-pocket premiums just to keep the policy in full force. The Trustees and the Masons claim that this was the first time in ten years of providing illustrations that anyone from Phoenix had revealed that the vanished premiums would return and, under certain likely scenarios, would rise to exorbitant levels.

¶ 11 In March 2000, the Trustees and the Masons filed a complaint against Phoenix and Lenenberg's company, Balanced Equities, Inc.,[5] asserting claims for fraud, negligent misrepresentation, reformation, breach of contract, and violation of the Unfair Trade Practices and Consumer Protection Law,[6] and bad faith under the Unfair Insurance Practices Act[7] in connection with the sales and servicing of the Masons' policy. Phoenix asserted that Appellants' claims were barred by the *Michels* class action settlement. In the summer of 2002, the parties filed cross-motions

for summary judgment and, on December 23, 2002, the Honorable Judith L.A. Friedman of the Allegheny County Court of Common Pleas granted Phoenix's motion for summary judgment as to all claims. These appeals followed.[8] In a subsequent opinion issued pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, the trial court explained that Appellants' claims were barred by the *Michels* class action settlement on grounds of *res judicata* and full faith and credit because Appellants' reliance on Phoenix's representations concerning the *Michels* class action settlement was unreasonable as a matter of law.

¶ 12 Appellants present the following issues for our consideration, which we have paraphrased:

1. Did the trial court err in granting summary judgment in favor of Phoenix by finding, as a matter of law, that the *Michels* class action notice was constitutionally adequate?

2. Did the trial court err in granting summary judgment in favor of Phoenix on the alternative basis that Appellants could not show, as a matter of law, that the *Michels* class action settlement was procured by fraud?

3. Did the trial court commit an error of law in holding that a Pennsylvania court may enforce an injunction entered by the court of another state as part of a class action settlement?

(Appellants' Brief at 2.) We first address Appellants' claim that the trial court erred

---

**5.** Although Appellants named Balanced Equities, Inc. as a defendant, it was never served as it was effectively out of business as a result of Lenenberg's fraud conviction and subsequent imprisonment.

**6.** 73 Pa.C.S.A. § 201–1 *et seq.*

**7.** 42 Pa.C.S.A. § 8371.

**8.** Because the notice of appeal filed on January 14, 2003 inadvertently omitted Mark and Myrna Mason, a separate notice of appeal was filed on their behalf on January 21, 2003. The two appeals subsequently were consolidated by order of this Court and Appellants have collectively briefed and argued these appeals.

**210** ■ ▬▬▬▬▬▬

in granting summary judgment to Phoenix by finding, as a matter of law, that the class action notice was adequate.

¶ 13 Our standard of review of an order granting or denying a motion for summary judgment is well established:

> We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Pappas v. Asbel,* 564 Pa. 407, 418, 768 A.2d 1089, 1095 (2001) (citations omitted).

▬▬ ¶ 14 The doctrine of *res judicata,* which underlies Phoenix's motion for summary judgment, bars repetitious litigation of the same cause of action. *Dempsey v. Cessna Aircraft Co.,* 439 Pa.Super. 172, 176, 653 A.2d 679, 681 (1995) (*en banc*). As we have stated, application of this doctrine requires that the lawsuits possess the following common elements: "(1) identity of the thing sued upon; (2) identity of the cause of action; (3) identity of the parties; and (4) identity of the capacity of the parties." *Taylor v. Shiley, Inc.,* 714 A.2d 1064, 1066 (Pa.Super.1998). Ordinarily, a judgment in a properly entertained class action is binding on all class members in any subsequent litigation, and class members who elect not to opt out of a class action are considered full members who must abide by the final judgment, whether favorable or adverse. *Id.* As the United States Supreme Court has recognized,

however, such a judgment will not be binding on a class member where notice of the class action settlement was inadequate. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811–812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). In the absence of adequate notice, a class action settlement cannot fix the rights of class members who do not opt out, and cannot bar them from seeking further relief. *Id.* Accordingly, as Phoenix concedes, absent class members such as the Masons and the Trustees may collaterally attack the *Michels* class action settlement on the ground that they did not receive adequate notice of the settlement. *See Twigg v. Sears Roebuck & Co.,* 153 F.3d 1222, 1226 (11th Cir.1998).

▬▬ ¶ 15 Adequate notice of a class action settlement is required by the constitutional mandate of due process. *Id.* This fundamental principle was first set forth in *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950):

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearances. But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met the constitutional requirements are satisfied .... But when notice is a person's due, process which is a mere gesture is not due process.

*Id.* at 314–315, 70 S.Ct. 652 (citations omitted). Notice is, as the Pennsylvania Supreme Court has stated, "the most basic requirement of due process." *Pennsylvania Coal Mining Ass'n v. Insurance Dept.*

*of Pa.,* 471 Pa. 437, 452, 370 A.2d 685, 692 (1977).

■ ¶ 16 To satisfy due process, notice of a class action settlement must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane,* 339 U.S. at 314, 70 S.Ct. 652. Although the notice need not be entirely comprehensive, the notice must not be misleading or materially incomplete. *Weinberger v. Kendrick,* 698 F.2d 61, 70 (2d Cir.1982). The notice must contain an adequate description of the proceedings written in objective, neutral terms that may be understood by the average absentee class member. *In Re Nissan Motor Corp. Antitrust Litig.,* 552 F.2d 1088, 1104 (5th Cir.1977). The notice also must "contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment." *Id.* at 1105.[9]

¶ 17 The question of whether constitutionally adequate notice can be provided to claimants whose injuries have not manifested at the time of the settlement is particularly problematic, and one which requires close scrutiny in light of the Supreme Court's decision in *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In *Amchem,* the Supreme Court confronted a challenge to class certification for settlement purposes in an asbestos litigation. The class defined in the complaint included both individuals who were presently injured, as well as individuals who had only been exposed to asbestos and had not yet manifested any injury. *Id.* at 602, 117 S.Ct. 2231. The Court held that this "sprawling" class was improperly certified because the class in that case could not satisfy the requirements of common issue predominance and adequacy of representation. *Id.* at 628, 117 S.Ct. 2231.[10] Although the Court did not rule on the issue of whether the notice given in that case was adequate, the Court questioned whether constitutionally adequate notice could ever be given to exposure-only claimants, particularly those who might not know that they had been exposed to asbestos dust or injured by it. The Court pointed out "the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous." *Id.*

¶ 18 In granting Phoenix's motion for summary judgment, the trial court in this case concluded that the *Michels* class action notice was constitutionally adequate because, in its opinion, "[t]here could be no doubt that both the Notice of Settlement and Phoenix's Brochure clearly conveyed to the reader that a policy such as the one

9. As some courts have recognized, an adequate notice also should contain information about either the amount or range of recovery. *See, e.g., Missouri v. Chadwick,* 956 S.W.2d 369, 386 (Mo.Ct.App.1997) (notice was inadequate as it failed to estimate the number of persons in the class, the total potential number of claims, the number of claims which it was estimated would be filed, the formula for determining each class member's recovery, or any other information by which the absent class members could determine their potential amount or range of recovery).

10. As to the adequacy-of-representation requirement of Rule 23(a)(4) of the Federal Rules of Civil Procedure, which governs class actions, the Court noted that the interest of present claimants asserting asbestos-related injuries conflicted with the interests of future claimants, both those who knew they had been exposed but had not manifested any injury, and those who had no manifest injury and did not even know that they had been exposed. *Amchem,* 521 U.S. at 622–25, 117 S.Ct. 2231.

at issue was covered by the class action settlement." (Trial Court Opinion, 2/14/03, at 7.) The trial court further held that it was unreasonable as a matter of law for the Trustees and the Masons to rely on any representations of Phoenix or its agent, Lenenberg, that were contrary to or inconsistent with the notice and settlement package. (*Id.* at 8.) According to the trial court,

> "[s]ince Phoenix was the opponent in the *Michels* lawsuit which Plaintiffs joined, they cannot be heard to say that it was *reasonable* to rely upon representations of Phoenix or the man they say they believed was its agent regarding the effect of the settlement. This is a matter about which reasonable minds could not differ. You do not consult your enemy about how to interpret documents in dispute.

(Trial Court Opinion, 12/23/02, at 1–2.)

¶ 19 Appellants argue that the trial court erred in granting summary judgment on the notice issue because there was at least a question of fact regarding the adequacy of the notice, and it was not unreasonable as a matter of law for them to rely on Phoenix's representations under the circumstances, where they had an ongoing business relationship with Phoenix relating to the policy, Phoenix was the only source of information concerning their policy, and Phoenix was specifically obligated to provide information about the class action by the terms of the settlement. For the following reasons, we agree.

¶ 20 As Appellants point out, nothing in the class action notice specifically referred to second-to-die policies, or to the possibility that a vanished premium for a second-to-die policy including an Optionterm component could reappear and quickly escalate. Neither did anything in the notice disclose that after the two years of Optionterm Charge Offset had been funded by Phoenix, policyholders such as Appellants with a second-to-die policy could have to pay millions of dollars of out-of-pocket payments to maintain sufficient Optionterm coverage to meet a target amount of insurance projected, sold, and repeatedly illustrated even during the opt-out phase of the class action as requiring no out-of-pocket payment whatsoever.

¶ 21 Significantly, Phoenix's own corporate designee, Robert Lautensack, admitted in his deposition that nothing in the class action notice provided specific information to enable the Masons and the Trustees to make an informed decision with respect to claims concerning out-of-pocket premiums required after the death of the first insured:

Q. I've already asked you this but I want to be sure it is covered, because it is one of the specific items in the corporate notice.

You indicated that there's no specific information within the class action notice to enable the plaintiffs—to make the Masons and trustees to make an informed decision with respect to claims concerning out-of-pocket premium payments required after the death of the first insured under the policy, is that correct?

A. That is correct.

(Deposition of Robert Lautensack, 10/30/01, at 189–90 (Exhibit F to Memorandum In Support of Plaintiffs' Motion for Summary Judgment, Vol. I) (R.R. 697a).) Paul Michael Fischer, Phoenix's Vice President of Life and Annuity, similarly testified that he did not recall the issue of out-of-pocket premiums due upon the death of the first insured being part of the settlement. (Deposition of Paul Michael Fischer, 6/28/02, at 219 (Exhibit D to Memorandum In Support of Plaintiffs' Motion for Summary Judgment, Vol. I) (R.R. 560a).)

¶ 22 Appellants in this case appear to have been in a situation analogous to many

of the exposure-only claimants in *Amchem*, *supra*. At the time of the settlement, Appellants had no reason to believe they had or were being defrauded as they had received numerous assurances from Phoenix and Lenenberg that their policy coverage was as originally represented in 1989. They arguably did not, as they claim, have the information or foresight needed to decide, intelligently, whether to stay in or opt out of the class action. Neither could Appellants have invoked the ADR process because, as Phoenix does not dispute, ADR was only available to those who had evidence of misrepresentation. Appellants did not know anything was wrong with their policy, or have any reason to doubt the veracity of Phoenix's and Lenenberg's representations, until over a year after the period for invoking ADR ended. Under these circumstances, we find that the trial court erred in concluding that the class action notice was constitutionally adequate as a matter of law.[11]

¶ 23 Neither can we agree with the trial court that it was unreasonable as a matter of law for Appellants to rely on Phoenix's representations about their policy, or on the purported advice of Lenenberg in telling them they should not opt-out or invoke ADR. As stated above, Phoenix was not just a defendant. Under the terms of the class action settlement, Phoenix was obligated to provide a hotline to answer questions.[12] Further, Phoenix was continuing to service the policy in the normal course,[13] so that the allegedly incomplete and misleading information it provided arguably came from it in its status as Appellants' continuing insurer, and not as part of the adversary process. Phoenix was the exclusive source of information concerning the projected performance of the policy.

¶ 24 We further note that Lenenberg's alleged advice to Appellants that their policy was not affected by the proposed settlement and that they should not opt out, if

11. Moreover, there is some support for the proposition that a party to a class release is precluded from interposing the release as a defense if it has failed to provide information to enable the class members to claim benefits under the class action settlement. *See In re Holocaust Victim Assets Litigation*, 105 F.Supp.2d 139, 158 (E.D.N.Y.2000) (court concluded that certain banks could not avail themselves of the benefits of releases under the settlement agreement while continuing to conceal from the class information needed to take advantage of the benefits conferred by the settlement agreement). In this case, Phoenix arguably is precluded from raising the *Michels* class action settlement as a bar to Appellants' claims if, as Appellants' allege, Phoenix concealed from Appellants information needed to apprise them that the ADR process was a relevant consideration (i.e., that Phoenix had misrepresented their policy terms).

12. Moreover, by the express terms of the settlement agreement, agents such as Lenenberg were permitted to discuss the proposed settlement with Phoenix policy owners. (Stipula-

tion of Settlement, 8/5/96, at 57.) As Dona D. Young, now Phoenix's Chairman of the Board, President and Chief Executive Officer, observed at the time in an internal videotape for Phoenix's agents, "[t]he most natural thing in the world for a policyholder to do is to call their agent and ask for the agent's advice." (Transcript of Phoenix videotape entitled "Michel's Lawsuit Video Conference Settlement Class Action Lawsuit," 8/12/96, at 40 (R.R. at 1606a).) Indeed, Phoenix promoted the settlement to its various agents as providing an opportunity for these agents to sell more insurance to class members and to market themselves and Phoenix to customers they might not have seen in a long time.

13. As the January 7, 1997 letter from Phoenix's then President and Chief Executive Officer reflects, agents were to continue conducting "business as usual" with their policyholders during the settlement period. (Phoenix letter from Robert Fiondella to producers, 1/7/97 (Exhibit 41 to Memorandum In Support of Plaintiff's Motion for Summary Judgment, Vol. 4) (R.R. 1802a).)

given, likely prevented Appellants from making a free and unfettered decision to opt out of the class. *See Georgine v. Amchem Products, Inc.*, 160 F.R.D. 478, 497 (E.D.Pa.1995) (court ordered second notice and opt-out period because, even though notice was adequate, communications by counsel opposed to the settlement likely confused and misled class members, prohibiting them from making a "free and unfettered" decision to opt out of the class).

¶ 25 For all of the foregoing reasons, we find that the trial court erred in granting Phoenix's motion for summary judgment because a question of fact existed as to whether, under all the circumstances of this case, the notice given to Appellants was constitutionally adequate. Accordingly, we reverse the order entering summary judgment.

¶ 26 Appellants next argue that the trial court erred in granting summary judgment in favor of Phoenix on the alternative basis that the *Michels* class action settlement was entitled to full faith and credit because Appellants could not show as a matter of law that it was procured by fraud. It appears that the sole basis for the trial court's ruling in this regard was the court's determination that it was unreasonable as a matter of law for Appellants to rely on the representations of Phoenix and Lenenberg, whether fraudulent or not. On remand, we direct the trial court to reconsider this aspect of Phoenix's summary judgment motion in light of this opinion.[14]

¶ 27 Order entering judgment **REVERSED**. Case **REMANDED**. Jurisdiction **RELINQUISHED**.

---

14.  Given our resolution of this appeal, we do    not reach Appellants' third issue on appeal.