822

Speros DRELLES and Marie D.
Drelles, husband and wife

v.

The MANUFACTURERS LIFE INSUR-
ANCE COMPANY, Manulife Finan-
cial, and Jeffrey Joel Sherman

v.

Speros Drelles

v.

Metropolitan Life Insurance Company
and Jeffrey Joel Sherman

Appeal of Speros Drelles.

Superior Court of Pennsylvania.

Argued Dec. 7, 2004.

Filed July 5, 2005.

Reargument Denied Sept. 19, 2005.

Kenneth R. Behrend, Pittsburgh, for appellant.

Richard F. Rinaldo, Pittsburgh, for Manulife, appellee.

Marshall J. Tindall, Pittsburgh, for Sherman, appellee.

B. John Pendleton, Jr., Newark, NJ, for Metropolitan Life, appellee.

Before: HUDOCK, MUSMANNO and TAMILIA, JJ.

HUDOCK, J.:

¶ 1 This is an appeal from the orders granting summary judgment in favor of all defendants on all counts presented in two separate actions which were consolidated in the trial court. We reverse the grant of summary judgment and remand for further proceedings.

¶ 2 The record discloses that Speros Drelles (Drelles) was covered by two five-year renewable and convertible participating term life insurance policies with accidental death benefit (ADB) (commonly called double indemnity) and with automatic waiver of premiums (AWP) upon proof of permanent and total disability. Both policies were issued by Metropolitan Life Insurance Company (MetLife) at a face amount of $50,000.00 and were guaranteed renewable until Drelles reached a specific age. (According to the policies' cover sheets, No. 23 129 046, issued in 1957, was guaranteed renewable "prior to age 65" while No. 617 218 870 PR, issued

in 1961, was guaranteed renewable "before age 66.") Jeffrey Joel Sherman (Sherman), an agent of MetLife, approached Drelles in 1988 and suggested converting the two renewable term policies to a single whole life policy with a $100,000.00 face amount. Sherman presented Drelles and his wife, Marie D. Drelles, with a proposal and illustrations representing that the premium payments for the new whole life policy would require out-of-pocket expenditures only for the first eight years of the policy's term. Sherman represented that by the ninth year, the whole life policy's premiums would be "paid up by" or "fully paid by" the cash dividends accruing on the policy and no more out-of-pocket expenditure would be required.[1] This sales technique is sometimes designated as a "vanishing premium" plan.

█ ¶ 3 Drelles completed an application for conversion of his renewable term life insurance policies in June of 1988. The new policy's premium was $369.00 per month, or $4,428.00 annually. The new policy was issued on June 14, 1988, at MetLife No. 882 634 905 PR (the 1988 policy). Subsequently, Sherman and William D. Hague (Hague) met with Drelles. Hague presented himself to Drelles as an account representative with MetLife and indicated that he is a licensed attorney. Sherman and Hague recommended that the Drelleses ought to purchase a second-to-die life insurance policy with a face

amount of $1,000,000.00.[2] The purpose of the survivorship policy was to defray the impact of federal estate taxes on the inheritance that presumptively will be left to the Drelleses' children.

¶ 4 Drelles concluded that $1,000,000.00 in coverage was unnecessary, but decided that a $500,000.00 insurance policy was warranted. The survivorship policy also was pitched to the Drelleses under a vanishing premium plan. According to Sherman and Hague, by the fourteenth year of the policy, the accumulated dividends would be sufficient to pay the annual premiums so there would be no more out-of-pocket expenditure required to keep the policy in force.

¶ 5 The Drelleses were convinced by the representations made by Sherman and Hague and decided to purchase a whole life survivorship policy under a vanishing premium plan. MetLife did not carry survivorship policies of the type Sherman and Hague discussed with the Drelleses. Consequently, the policy application was placed with Manufacturers Life Insurance Company (Manufacturers). On April 12, 1990, Manufacturers issued the survivorship policy to the Drelleses in a face amount of $500,000.00, as Manufacturers Policy No. 5 117 835–8 (the 1990 policy).

¶ 6 Vanishing premium insurance plans are a product of the soaring interest rates of the late 1970s and early 1980s. *Cotton*

---

1. In the insurance industry, the term "dividend" refers to a partial premium refund on a participating insurance policy reflecting the difference between the premium charged and actual cost and investment-return experience. *See Glossary of Life Insurance Terms*, at http://www.fromall angles.com/glossary/ term-life-insurance /terms/policy- dividend.htm (last visited April 15, 2005). Insurance dividends are similar in concept, but not identical with, stock dividends. *See* Black's Law Dictionary, 512–13 (8th ed. 2004) (discussing dividends). An insurance dividend is a different

matter from accrued interest which is based on the cash value of a whole life policy.

2. As the name implies, "second-to-die" insurance is a form of joint life insurance that pays a death benefit only upon the demise of the second named insured to die. It is often used by a married couple in estate planning and is also called dual life insurance or survivorship insurance. *See* Black's Law Dictionary, 821–22 (8th ed. 2004) (discussing insurance forms).

*v. Massachusetts Mutual Life Insurance Company*, 402 F.3d 1267, at 1273 n. 4, 2005 U.S.App. Lexis 4330, at *8 n. 4 (11th Cir. filed March 16, 2005).

> During this time, "the economics of traditional whole life insurance policies turned unattractive" because the policies generally "earned a rate of return based on the average interest rate of the predominately fixed-rate securities in the company's investment portfolio, which generally had interest rates that were much lower than the rates then available to consumers." Daniel R. Fischel & Robert S. Stillman, *The Law and Economics of Vanishing Premium Life Insurance*, 22 Del. J. Corp. L. 1, 5 (1997). The industry responded to this phenomenon by offering consumers several new types of interest-sensitive policies. These new policies differed from traditional whole life insurance in that their returns were based on current interest rates rather than the interest and dividend income produced by the insurance company's historical investments. *Id.* at 5–6. The vanishing premium plan was one common payment option for these new types of policies; Professors Daniel R. Fischel and Robert S. Stillman describe the economics of its rise and fall as follows:

> > In a vanishing premium plan, the policyholder pays higher-than-normal premiums in the early years of the policy. By making higher payments in early years, a higher fraction of premium dollars is distributed into the policy's savings account (i.e., accumulation fund), allowing the cash value of the policy to accumulate faster. The goal of a vanishing premium plan is to set premiums at a level where, after a certain number of years, enough cash value has accumulated within the policy so that future administrative and insurance costs can be paid out of the accumulation fund, with no further out-of-pocket payments by the policyholder. In the mid–1980s, when the new policies were marketed most aggressively, the assumption of most vanishing premium "illustrations" was that no further out-of-pocket premiums would be required after five or ten years.

> *Id.* Vanishing premium plans did not work as contemplated primarily because low interest rates upset the economics of the plans. *Id.* Although rates rose as high as twelve percent in the mid–1980s, in the 1990s they fell to close to three percent. *Id.* With the economy-wide decline in interest rates, cash value ceased to grow at a rate anywhere near sales projections and illustrations. *Id.* As a result, cash value has proven to be insufficient to pay the cost of the insurance. *Id.* Many consumers who bought insurance on a vanishing-premium basis were forced to make out-of-pocket premium payments well beyond the expected term of years. *Id.* In some instances, the insurance was terminated or the death benefits reduced. *Id.*

¶ 7 By the early 1990s, the national media began presenting information on deceptive marketing and sales practices in the life insurance industry. Several class action suits arose in the federal courts involving the various insurance companies implicated. Drelles learned through local news media coverage that MetLife's insurance agents were implicated in the allegations of industry-wide deceptive marketing practice.[3] These deceptive practices included marketing whole life insurance poli-

---

3. The complaint filed against MetLife alleges that Drelles first learned of the deceptive insurance industry practices on or about April 9, 1994, and that he contacted MetLife within a month of obtaining this information. Complaint filed at GD–95–16273, at 17 ¶¶ 50–51.

cies under vanishing premium plans of the same type the Drelleses purchased. A multi-district federal class action suit was filed against MetLife over these allegedly illegal sales practices. MetLife settled this suit in December of 1999. *Drelles v. Metropolitan Life Insurance Company*, 90 Fed.Appx. 587, 2004 U.S.App. Lexis 2210, *1 (3d Cir. filed January 12, 2004). However, the Drelleses opted out of the federal class action litigation, preferring to present their claims against MetLife and Manufacturers in state court. *Id.*

¶ 8 On October 6, 1995, the Drelleses commenced an action against MetLife and Sherman by writ of summons, at GD–95–16273 (the 1995 litigation). The Drelleses commenced a second and separate action against Manufacturers and Sherman by writ of summons at GD–96–14270, filed September 30, 1996 (the 1996 litigation). Upon motion, the trial court consolidated the two actions under GD–95–16273 on September 15, 2000. In both the 1995 and 1996 litigation, the Drelleses alleged common law fraud and deceit, negligence, violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL),[4] negligent supervision, and breach of an implied covenant of good faith and fair dealing.

¶ 9 The consolidated matter proceeded through discovery. In December of 2003, the insurance companies and Sherman moved for summary judgment. On December 8, 2003, the trial court dismissed the complaint filed at GD–95–016273 as well as the counts against Sherman in the complaint filed at GD–96–014270. Several counts of the consolidated case remained pending against Manufacturers. The Drelleses filed an appeal from the trial court's order, which was docketed at Superior Court No. 82 WDA 2004. We quashed the appeal on February 26, 2004.

On February 12, 2004, the trial court granted Manufacturers' petition for permission to file a motion for summary judgment. Subsequently, on May 17, 2004, the trial court granted the ensuing motion for summary judgment and dismissed all remaining counts of the consolidated action. The Drelleses filed a timely notice of appeal on May 27, 2004. The trial court's docket does not indicate that the trial court ordered the Drelleses to file a Rule 1925(b) statement, and none appears to have been filed.

¶ 10 Procedurally, the trial court's action can be summarized as follows: In the 1995 litigation, the trial court dismissed all the claims related to the 1988 policy raised against MetLife and Sherman on the grounds that they were barred by the relevant statutes of limitations and that the discovery rule and concealment doctrine did not apply. As to the 1990 policy, the subject of the 1996 litigation, the trial court dismissed the fraud and negligence claims on the grounds that they were time-barred and that the discovery rule and concealment doctrine did not apply. The trial court dismissed the claim for breach of implied covenant of good faith and fair dealing because this type of claim cannot serve as the basis for a separate cause of action. Finally, the trial court dismissed the UTPCPL claims in the 1996 litigation, although they were timely, upon a ruling that, as a matter of law, the Drelleses could not establish that they reasonably relied on Sherman's representations. *See* Trial Court Opinion, 12/8/03, at 25–34 (discussing rationale for concluding that the discovery rule does not apply as asserted by the Drelleses). The trial court's order of May 17, 2004, indicates that it relied on the same rationale espoused in its prior opinion and order in dismissing all remain-

4. 73 P.S. §§ 201–1 to 201–9.3.

ing counts of the complaint filed at GD–96–14270.

¶ 11 The Drelleses (hereafter jointly Appellants [5]) present the following three issues for our review:

1. Did the Trial Court err in granting summary judgment based upon the statute of limitations and not tolling the statute of limitations through application of the Discovery Rule by holding Mr. Drelles to a unique standard and not to the standard of a reasonable person, and concluding that it was reasonably possible for Mr. Drelles in the exercise of due diligence at the time of sale of the insurance policy to discover the material misrepresentations regarding vanishing premiums made to induce the sale?

2. Did the Trial Court err in granting summary judgment based upon the statute of limitations and not tolling the statute of limitations through application of the Discovery Rule by holding Mr. Drelles to a standard unique to Mr. Drelles rather than a reasonable person standard, and concluding that it was reasonably possible for Mr. Drelles with the exercise of due diligence to discover the material misrepresentations made at the time of sale to induce the sale regarding the amount of premiums required to fund the second-to-die policy?

3. Did the Trial Court err in granting summary judgment by requiring [Appellants] to prove "reasonable" or "justifiable" reliance rather than "ordinary" reliance standard to establish their unfair business practices claims arising under the [UTPCPL], 73 P.S. Section 201–2(4),

subsections: ii, v, vii, and xv, which require only a showing of ordinary reliance, in the sale of the 1990 Manufacturers Life Second to Die Life Insurance Policy[?]

Appellants' Brief at 3. Appellants' first two issues essentially raise the same question, and Appellants have argued it in that fashion in their brief.

▮▮▮ ¶ 12 "Our review of the trial court's grant of summary judgment is plenary." *Blumenstock v. Gibson*, 811 A.2d 1029, 1033 (Pa.Super.2002), *appeal denied*, 573 Pa. 714, 828 A.2d 349 (2003).

> Summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions and affidavits and other materials demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. We apply the same standard of review as the trial court in that we view the record in the light most favorable to the party opposing the motion and resolve all doubts as to the existence of a genuine issue of material fact in favor of the nonmoving party. We will reverse the trial court's grant of summary judgment only upon an abuse of discretion or error of law. ·

*Id.* (citation omitted). An abuse of discretion or failure to exercise sound discretion is not merely an error of judgment. *In re Deed of Trust of Rose Hill Cemetery Association*, 527 Pa. 211, 216, 590 A.2d 1, 3 (1991). But if, in reaching a conclusion, the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable or lacking in reason, discretion must be held to have been abused. *Id.* The issue of whether there are genuine issues as to any material fact presents a question of law, in which case our standard

5. Certain matters pertain only to Drelles, and not to his wife. With respect to those matters, we shall continue to identify Drelles separately.

of review is *de novo*. *Fine v. Checcio*, 870 A.2d 850, 2005 Pa. Lexis 596, \*12 n. 3 (Pa. filed March 30, 2005 and amended April 1, 2005). Thus, we need not defer to the determinations made by the trial court. *Id.*

¶ 13 Appellants claim that the trial court erred by concluding that Drelles is an expert in the insurance trade and in holding Appellants to the higher standard applicable to an expert. Appellants contend that, in consequence, the trial court erred by refusing to apply the discovery rule to toll the limitations period for their claims. The statute of limitations in this Commonwealth for claims of common law fraud and negligence is two years. 42 Pa.C.S.A. § 5524(7). The statute of limitations for UTPCPL claims is six years. 42 Pa.C.S.A. § 5525(8). In Pennsylvania, limitations periods are computed from the time the cause of action accrues. *Fine*, 870 A.2d at 857, 2005 Pa. Lexis 596 at \*13. Thus, the relevant statute of limitations begins to run as soon as the right to institute and maintain a suit arises, which generally is when the injury was inflicted. *Id.*

¶ 14 "Mistake, misunderstanding, or lack of knowledge in themselves do not toll the running of the statute." *Id.* "Once a cause of action has accrued and the prescribed statutory period has run, an injured party is barred from bringing his cause of action." *Id.* at 857, 2005 Pa. Lexis 596 at \*14. There are, however, exceptions that act to toll the running of a statute of limitations. *Id.* at 858, 2005 Pa. Lexis 596 at \*14 The discovery rule and the doctrine of fraudulent concealment are such exceptions. *Id.* In this case, Appellants seek to apply the discovery rule to avoid the limitations bar.

¶ 15 The discovery rule originated in cases in which the injury or its cause was neither known nor reasonably know-

able. *Id.* The purpose of the rule is to exclude from consideration that period of time during which a party who has not suffered an immediately ascertainable injury remains "reasonably unaware" so that he has essentially the same rights as those who have suffered an immediately ascertainable injury. *Id.* at 858, 2005 Pa. Lexis 596 at \*14–15. As the discovery rule has developed, the key point that gives rise to its application is the inability of the injured party, despite the exercise of reasonable diligence, to know that he has been injured and by what cause. *Id.* at 858, 2005 Pa. Lexis 596 at \*15.

¶ 16 Our Supreme Court has explained that "reasonable diligence" is not an absolute standard. *Id.* Rather, it is "what is expected from a party who has been given reason to inform himself of the facts upon which his right to recovery is premised." *Id.* As the Supreme Court stated:

There are very few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence. Put another way, the question in any given case is not, what did the plaintiff know of the injury done him? But, what might he have known, by the use of the means of information within his reach, with the vigilance the law requires of him?

*Id.* at 858, 2005 Pa. Lexis 596 at \*15–16 (citations and quotations omitted). Although "reasonable diligence" is an objective test, it must remain "sufficiently flexible to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." *Id.* at 858, 2005 Pa. Lexis 596 at \*16 (citation and quotation omitted). A

party's actions must be evaluated to determine "whether he exhibited those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interest and the interest of others." *Id.* (citation and quotation omitted).

¶ 17 When a court is presented with the assertion that the discovery rule applies, it must address the ability of the damaged party, exercising reasonable diligence, to ascertain that he has been injured and by what cause. *Id.* Because this question "involves a factual determination as to whether a party was able, in the exercise of reasonable diligence, to know of his injury and its cause, ordinarily, a jury is to decide it." *Id.* at 858, 2005 Pa. Lexis 596 at *16–17. However, where reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, the court determines, as a matter of law, that the discovery rule does not apply. *Id.* at 858–59, 2005 Pa. Lexis 596 at *17.

¶ 18 When the discovery rule applies, the statute of limitations does not commence to run at the instant that the right to institute suit arose. *Id.* at 859, 2005 Pa. Lexis 596 at *17

Rather, the statute is tolled, and does not begin to run until the injured party

discovers or reasonably should discover that he has been injured and that his injury has been caused by another party's conduct. Whether the statute of limitations has run on a claim is a question of law for the trial court to determine; but **the question as to when a party's injury and its cause were discovered or discoverable is for the jury.**
*Id.* at 859, 2005 Pa. Lexis 596 at *17–18 (emphasis added; citations omitted). It is not relevant to the discovery rule's application whether the prescribed period has expired. *Id.* The discovery rule applies "to toll the statute of limitations in any case where a party neither knows nor reasonably should have known of his injury and its cause at the time his right to institute suit arises." *Id.* at 859, 2005 Pa. Lexis 596 at *20.[6]

¶ 19 In this case, the trial court determined that the right to file suit based on the 1988 policy arose in June of 1988, when that policy was delivered and was not returned either to MetLife or to Sherman within the ten-day "right to examine" period extended on the cover page of the policy. We agree. *See Toy v. Metropolitan Life Insurance Company,* 863 A.2d 1, 8 (Pa.Super.2004) (upholding trial court's ruling that injury occurred when insurance policy was delivered and plaintiff assented to its terms by not returning it within reconsideration period).[7] Prior to the ex-

---

6. In addition to the discovery rule, the doctrine of fraudulent concealment also tolls the running of a statute of limitations. *Fine,* at 860, 2005 Pa. Lexis 596 at *23. The doctrine is based on estoppel and provides that a defendant may not invoke the statute of limitations if, through fraud or concealment, he caused the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts. *Id.* The doctrine does not require "intent to deceive," but only "unintentional deception." *Id.* Thus, the doctrine "captures" unintentional conduct on a defendant's part. *Id.* at 861, 2005 Pa. Lexis 596 at *25. The standard of reasonable diligence applicable to the discov-

ery rule also applies to the doctrine of fraudulent concealment. *Id.* at 861, 2005 Pa. Lexis 596 at *25. While it is for the court to determine whether estoppel results from established facts, it is for the jury to say whether fraudulent remarks actually were made. *Id.* at 860, 2005 Pa. Lexis 596 at *23.

7. More than two hundred cases currently are pending before the Court of Common Pleas of Allegheny County alleging improper insurance sales practices. Trial Court Opinion, 12/08/03, at 1. The trial court selected seven "test cases" to try initially. *Id.* The appeal in *Toy* originated as one of these test cases, as

piration of this ten-day period, Drelles could have voided the contract for insurance and obtained a full refund. Upon expiration of the ten-day period, he lost his right to reconsider. Under *Toy,* he sustained injury at that point. Because he did not file suit on the 1988 policy until 1995, all claims related to the 1988 policy appear to be time barred.

¶ 20 The same analysis applies to the 1990 policy. Appellants' right to institute suit based on this policy arose in April of 1990 when they received a copy of it in the mail and did not return it to Manufacturers or Sherman within the ten-day "right to examine period." Because they did not file suit on the 1990 policy until after the statutory period had run, as counted from the policy's delivery date, all of Appellants' causes of action governed by a two-year statute of limitations would appear to be time barred.

¶ 21 In rejecting application of the discovery rule, the trial court made the factual finding, based on Drelles' educational and professional background in the world of finance and investing, that he was "an extremely sophisticated investor." Trial Court Opinion, 12/8/03, at 26–27. The trial court then ruled that Drelles' skills in the investment field qualified him as being skilled in the insurance arena as well. We find that the record supports the trial court's conclusion that Drelles is a "sophisticated investor." *See* Motion for Summary Judgment, 3/3/04, Exhibit "4" (comprising Drelles' curriculum vitae indicating that he earned an MBA as well as a baccalaureate degree in business administration from the University of Michigan at Ann Arbor and establishing his work history as an investment analyst and financial

market forecaster experienced in developing investment strategies for both individual and institutional clients and/or employers). Undoubtedly, Drelles' training and background qualify him to evaluate whether investment in the insurance sector constitutes a sound financial move or whether a particular insurance company has a good reputation and whether its stock is "sound" in the sense that its reserves are adequate to fulfill policy obligations. However, these are different questions than whether a "vanishing premium" plan is valid or whether the representations in a sales pitch are consistent with policy language. We find no support in the record for the conclusion that Drelles' background provided him with any special understanding of the insurance industry or its particularized terminology.

¶ 22 The trial court noted that Drelles understood the difference between term life insurance and whole life insurance. Trial Court Opinion, 12/8/03, at 32. While this may be true, nothing in the record demonstrates that Drelles' experience and training extended to the inner workings of the life insurance industry with regard to calculating administrative expense and commission loading for whole life insurance vehicles so that he could accurately predict probable dividend performance. Nor does the record demonstrate that he was an expert in insurance underwriting or actuarial risk analysis. More important, nothing of record in this case indicates that Drelles had any special expertise or training in the interpretation and application of insurance policy provisions. Specifically, there is no indication that Drelles was skilled in the interpretation of individual or survivorship whole life insurance

did the present appeal. *Id.* We note that *Toy* involved both an insurance sale and a contested "50/50 savings plan" sale. The present appeal stems solely from the sale of insurance

policies. *See also Ihnat v. Pover,* 35 Pa. D. & C.4th 120 (Com.Pl. Allegheny County 1997) (indicating that between two and five hundred such suits were filed).

834

vehicles such that, as a matter of law, he ought to have been able to see through Sherman's "vanishing premium" presentations.

¶ 23 In short, the record contains no evidence that Drelles had any particular education, experience, or skill in life insurance, other than his thirty year consumer relationship with MetLife. Therefore, it is a question for a jury to determine whether Drelles' concededly sophisticated investment skills make him more capable than the average consumer of knowing, through the exercise of reasonable diligence, that Sherman misrepresented certain aspects and provisions of the 1988 and 1990 insurance policies. In reaching its decision, the trial court interpreted the facts established by the parties against Appellants, the non-moving parties, thereby contravening the proper legal standard. *See Blumenstock*, 811 A.2d at 1033 (holding that all doubts as to the disputed existence of a genuine issue of material fact must be resolved in favor of the non-moving party).

¶ 24 The next question to be resolved is whether, as a matter of law, Appellants failed to exercise "reasonable diligence" in ascertaining their injuries. Reasonable diligence comprises a "reasonable effort to discover the cause of an injury under the facts and circumstances present in the case." *Toy*, 863 A.2d at 7. Although there are few facts which diligence cannot discover, a reason must exist "to awaken inquiry" and "direct diligence in the channel in which it would be successful." *Id.* Reasonable diligence is an objective rather than a subjective standard. *Id.* A party is not under an absolute duty to discover the cause of his injury; rather, he must exercise only that level of diligence that a reasonable person would employ under the facts and circumstances presented in a particular case. *Id.*

¶ 25 This standard takes into account the differences between persons and their capacity to evaluate the circumstances confronting them at a given time. *Id.* As discussed above, however, nothing in the record supports the trial court's decision to hold Appellants to a standard higher than that applicable to a "reasonable person." Thus, we must evaluate whether Appellants exhibited those qualities of attention, knowledge, intelligence and judgment which society generally requires of its members for the protection of their own interests and the interests of others. *See Fine*, 870 A.2d at 858, 2005 Pa. Lexis 596 at *16 (establishing "reasonable person" standard of "reasonable diligence"). We do not analyze whether Appellants demonstrated the reasonable diligence to be expected of an insurance expert.

¶ 26 "When a plaintiff seeks to benefit from the discovery rule, he/she has the burden of establishing his/her inability to know of the injury despite the exercise of due diligence." *Toy*, 863 A.2d at 7 (citing *Dalrymple v. Brown*, 549 Pa. 217, 224, 701 A.2d 164, 167 (1997)). If the issue in a case involves a factual determination of what constitutes a reasonable time for the plaintiff to discover his or her injury and its cause, this issue is usually for the jury. *Toy*, 863 A.2d at 7. The commencement period may be established as a matter of law only when the facts are so clear that reasonable minds cannot differ. *Id.* at 7–8.

¶ 27 In this case, after transposing Drelles' investment skills to the insurance field, the trial court concluded that a mere cursory review of the policy would have disclosed what actually was purveyed and that it differed from Sherman's representations. Therefore, the trial court concluded that the discovery rule did not save Appellants' claims. Trial Court Opinion,

12/8/03, at 32. Specifically, the trial court stated:

> In his own financial transactions, Mr. Drelles is not a purchaser who would be overwhelmed by a skillful presentation. He testified that when making investment decisions as part of his job, he never relied solely on oral statements of an individual on what is an appropriate **investment** choice. He knew the difference between term life and whole life insurance. He would be expected to have some questions about a proposed **investment** package (which was not an annuity) that did not appear to be dependent upon interest rates or the performance of the stock market. He was shown charts that he was capable of understanding, which showed that this transaction had something to do with interest rates and accumulated value. Also, he was capable of learning what he had actually purchased through a cursory examination of the insurance policies.

*Id.* (emphasis added).

¶ 28 The trial court clearly relied on Drelles' purported special expertise to conclude that he could not reasonably have been misled by a skillful presentation, that he ought to have seen through Sherman's charts, and that he had the tools to ascertain that Sherman made misrepresentations to induce insurance sales. *Id.* at 32–33. However, we have already determined that the record does not support a conclusion that Drelles was highly skilled in the insurance field. The trial court did not apply an objective reasonable diligence standard consistent with *Dalrymple* and *Toy*. Rather, it interpreted the record against the non-moving party and made a credibility assessment as to Drelles' purported insurance savvy. Factual findings and credibility determinations are matters for the jury. *Choma v. Iyer*, 2005 PA Super 96, ¶ 18, 871 A.2d 238 (2005) (*en banc*); *Toy*, 863 A.2d at 7; *Blumenstock*, 811 A.2d at 1033. The trial court's reliance on what it improperly determined to be Drelles' skills in the insurance context was not a proper basis for concluding that, as a matter of law, the discovery rule does not apply in this case.

¶ 29 The trial court also held that, as a matter of law, Appellants cannot demonstrate reasonable reliance on Sherman's representations because they had copies of their policies and could have learned that the policies varied from the insurance proposals merely by reading the cover sheets of the policies and inspecting the contents of the policy provisions. Trial Court Opinion, 12/08/03, at 32–34. Setting aside for the moment the factual issue underlying this ruling, it constitutes a misapplication of the standard to which Pennsylvania law holds an insured concerning the requirement to investigate the contents of an insurance policy. There is no requirement that a non-commercial life insurance customer must scrutinize an insurance policy to ascertain its provisions and thereby determine whether the policy accords with the insurance agent's representations and meets the insured's expectations. *Rempel v. Nationwide Life Insurance Company, Inc.*, 227 Pa.Super. 87, 323 A.2d 193, 197 (1974), *aff'd*, 471 Pa. 404, 370 A.2d 366 (1977) (plurality).[8] *See also Pressley v. The Travelers Property Casualty Corporation*, 817 A.2d 1131, 1141 (Pa.Super.2003) (holding that non-commercial policyholder has no duty to read liability policy where coverage in policy as issued differed from representations made by agent).

---

8. Our Supreme Court recently cautioned that its opinion in *Rempel* was a plurality decision that lacks precedential value. *Bilt–Rite Con-tractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 461 n. 2, 866 A.2d 270, 275 n. 2 (2005).

¶ 30 This Court has held that an insurance agent's expertise in the field of life insurance vests his or her representations with authority and tends "to induce the insured to believe that reading the policy would be superfluous." *Rempel*, 323 A.2d at 197. *Accord Pressley*, 817 A.2d at 1140–41. Establishing a requirement that an insured is responsible for ascertaining the contents of a life insurance policy would virtually eliminate the possibility of establishing a *prima facie* case of negligent misrepresentation by creating an "insoluble dilemma." *Rempel*, 323 A.2d at 197.

> If the insured failed to read the policy he would lose because he could not establish justifiable reliance; but, if he did read the policy he could not show that he in fact relied upon the representations of the agent with regard to its contents. We therefore hold that whether or not justifiable reliance has been established is a question of fact for the jury, to depend, inter alia, on the relative position of the parties, their expertise and experience.

*Id. See Rempel*, 471 Pa. at 412, 370 A.2d at 369 (stating that policyholder has no duty to read policy unless circumstances make it unreasonable not to read it). *Compare Matcon Diamond, Inc. v. Penn National Insurance Company*, 815 A.2d 1109, 1115 (Pa.Super.2003) (holding that even in commercial context, liability carrier cannot avoid coverage by issuing policy with terms that vary from provisions sought by insured).

¶ 31 Moreover, "normal" contract principles do not apply to insurance transactions. *Pressley*, 817 A.2d at 1139.

Life insurance policies are contracts of adhesion and the adhesionary nature of life insurance documents is such that a non-commercial insured is under no duty to read the policy as issued and sent by the insurance company. *Collister v. Nationwide Life Insurance Company*, 479 Pa. 579, 589–90, 388 A.2d 1346, 1351 (1978). Courts must be alert to the fact that the expectations of the buying public are in large measure created by the insurance industry itself. *Tonkovic v. State Farm Mutual Automobile Insurance Company*, 513 Pa. 445, 456, 521 A.2d 920, 926 (1987).

> Through the use of lengthy, complex, and cumbersomely written applications, conditional receipts, riders, and policies, to name just a few, the insurance industry forces the insurance consumer to rely upon the oral representations of the insurance agent. Such representations may or may not accurately reflect the contents of the written document and therefore the insurer is often in a position to reap the benefit of the insured's lack of understanding of the transaction.

*Id.* In particular, the life insurance industry, despite repeated cautions from the courts, has persisted in using language which is obscure to a layman and, in tolerating agency practices, calculated to lead a layman to believe he has coverage beyond that which may be called for by a literal reading of the policy. *Id.*[9] Regardless of the ambiguity, or lack thereof, inherent to a given set of insurance documents (whether they be applications, conditional receipts, riders, policies, or whatever), courts must examine the dynamics of the insurance transaction itself to ascertain the rea-

---

**9.** *Tonkovic* stems from a dispute over the terms of a disability insurance policy, not a life insurance policy. However, the cases on which *Tonkovic* relies were decided in the context of disputes over life insurance policies and the Supreme Court made no distinction between the types of coverage at issue. Rather, the Supreme Court's focus in *Tonkovic,* as in other cases, has been on whether the insured was a commercial or non-commercial consumer of insurance. *See, e.g., Collister, supra.*

sonable expectations of the consumer. *Id.,* 513 Pa. at 456–57, 521 A.2d at 926.

¶ 32 With respect to the discovery rule's application, we next address what the record reveals concerning Appellants' ability, exercising reasonable diligence, to discover their injuries and the cause of those injuries. MetLife, Manufacturers and Sherman (collectively Appellees) argue that the record establishes, as a matter of law, that Appellants knew or should have known, in the exercise of reasonable diligence, that they were injured by Sherman's representations upon receipt of the 1988 and 1990 policies. Appellees support this argument with an assertion that the "plain language" of the policies stated the final version of the terms, conditions, and risks of the parties' agreement and established the premiums to be paid. Thus, Appellees contend that the policies themselves notified Appellants of any inconsistencies between those allegedly unambiguous terms and Sherman's purported representations at the point of sale.

¶ 33 The record demonstrates that Sherman presented the insurance products to Appellants as analogous to investment plans. Nevertheless, Sherman did not sell stocks, bonds or mutual funds to Appellants. He sold them insurance products. The investment aspect of the plans presented by Sherman addressed out-of-pocket cash outlay, projected cash values, projected interest rates, dividends, returns, and savings. The insurance aspect of the policies involved, among other things, premiums, policy conversions, mortuary tables, nonforfeiture values, policy loans, projected interest, guaranteed interest, accelerated payment plans, paid up additions, administrative charges, undisclosed commission rates, undisclosed administrative loading, policy classifications, dividend reductions, accumulated cash values, reduced paid up insurance and other nonfor-

feiture provisions. While Drelles may have appreciated the investment aspect of the 1988 and 1990 policies, we find that reasonable minds could differ as to whether he, or any other reasonable consumer, could appreciate the insurance aspect of the whole life and second-to-die policies sufficiently to ascertain from the policies themselves whether Sherman misrepresented certain details about them at the time of sale.

¶ 34 When a plaintiff seeks to benefit from the discovery rule, he has the burden of establishing his inability to know of the injury despite the exercise of due diligence. *Toy,* 863 A.2d at 7. By rejecting the discovery rule as a matter of law, the trial court determined that the facts of this case were so clear that reasonable minds could not differ as to whether Appellants knew or could have known of their injury and its cause. We disagree. Viewing the evidence in the light most favorable to Appellants, we find that they have met their burden sufficiently to survive a motion for summary judgment with regard to their entitlement to rely upon Sherman's representations. Even if Appellants were required to scrutinize the policies, the policies themselves do not provide all the information needed to determine whether Sherman misrepresented the vanishing premium insurance plans at the time of sale.

¶ 35 The insurance policies at issue here are based on assumptions that are not explicitly defined in the policy provisions and to which Appellants were not privy. Such assumptions include the administrative loading mechanics for calculating policy premiums, dividends, and nonforfeiture values. Both policies include a so-called "Table of Values" which enables the insured to **calculate** various projected values based on certain assumptions. But deriving values by performing calculations

is a different and more complicated matter than simply reading the terms of a policy.

¶ 36 The MetLife policy refers to certain mortality tables and indicates that cash surrender and nonforfeiture values are calculated in accord with "the standard nonforfeiture law." MetLife Policy No. 882 634 905 PR, at 5. The policy does not specify where the insured can get copies of the mortality tables nor does it explain what is meant by "standard nonforfeiture law." Moreover, the MetLife Policy indicates that the Table of Values in the policy does not take into account the impact of dividends and explicitly states that "[t]he method of computation will be furnished on request." *Id.*, at 8. Clearly, the policy would not refer to information that will be furnished "on request" if that information were already provided within the policy.

¶ 37 The Manufacturers policy indicates that the basic values of the second-to-die policy can be **calculated** based on the "Table of Values" on page 3. Manufacturers Policy No. 5 117 835–8, at 10. The policy states that the *"basic value* at any time is equal to the then present value of the paid-up insurance[.]" *Id.* (emphasis added). However, the Table of Values provides a list of "Basic Values" and "Paid–Up Insurance Values" that are not the same for any given policy year. *Id.* at 3. Furthermore, the policy does not explain clearly, in an easy to find manner, what the difference is between "basic value" and "cash value" for the policy. While these apparent discrepancies are no doubt comprehensible to one who is well-versed in the practices of the insurance industry, the policy itself does not reconcile the terminology in a manner which is easily ascertainable by an "outsider."

¶ 38 The policy also states that Manufacturers has "filed a detailed statement of our method of computing [values] with [the insured's] State's insurance department." *Id.* at 10. However, this "detailed statement" was not provided in the policy itself. In other words, the terminology, underwriting assumptions, administrative load and value calculations underlying the policies at issue here possibly may be well-understood within the insurance industry but, otherwise, are not readily obvious even to a "sophisticated investor" unless he or she also happens to be an expert in these insurance-specific matters.[10]

¶ 39 Moreover, we are not persuaded by the trial court's reasoning that the policies themselves contradict Sherman's "vanishing premium" sales pitch in that the policies state that premiums are payable for a term of years that extends well beyond the eight to fourteen year period projected by Sherman's various illustrations. The MetLife policy indicates that premiums are payable for forty-one years. MetLife Policy No. 882 634 905 PR, at 3. The Manufacturers survivorship policy states that premiums are payable to "second death, or to age 99 of the younger of the surviving lives." Manufacturers Policy No. 5 117 835–8, at 1. Nevertheless, the illustrations are clear that Sherman never represented

---

**10.** A second-to-die policy may be subject to a dramatic change in actuarial status upon the demise of the first insured to die. *Wilkes v. Phoenix Home Life Mutual Insurance Company,* 851 A.2d 204, 207 (Pa.Super.2004). Such an actuarial shift can alter both the policy value and the relevant premium calculations resulting in an increase rather than a decrease in premiums. *Id.* Moreover, it is possible in some instances that a premium which

previously had "vanished" would reappear and actually escalate at a steep rate. *Id.* Nothing of record indicates that the Manufacturers second-to-die policy at issue in this case was underwritten in the same manner employed in *Wilkes.* We merely point out that the underwriters' actuarial assumptions have not been detailed in the Manufacturers policy and Appellants could not know of them through a cursory inspection.

that the policies would be "fully paid" or that no more premiums would be due within eight to fourteen years in contravention to the policies' terms. What Sherman represented is that the out-of-pocket outlay attributable to the premiums would cease within that time frame due to a combination of new dividends and application of accumulated cash value stripped from the converted policies.[11]

¶ 40 Drelles has, upon occasion (in deposition and elsewhere) used insurance industry terms of art loosely and inaptly. However, insurance terminology can be confusing. For example, the term "paid up," as used in the insurance industry has different connotations depending on context. "Paid up" insurance refers to an insurance policy on which all required premiums have been paid. But "paid up" also refers to the reduced "paid up" insurance available as a nonforfeiture option in most whole life or universal life policies. *See* **Glossary of Life Insurance Terms**, at http://www.fromall angles.com/glossary/ term-life-insurance/ terms/paid-up- insurance.htm (last visited April 15, 2005). Moreover, as we have noted several times, there is nothing in the record to support the conclusion that Drelles was an expert concerning insurance or the vocabulary employed within that industry. Thus, there is no basis for requiring him to use insurance terms of art in the same manner as would an insurance expert or even as a lawyer might.

■ ¶ 41 Whether Appellants relied, solely or in part, on representations made in the "insurance context" (when Drelles indicated he would not rely solely on oral representations in the "investment context") goes to his credibility, a matter for the jury to resolve. Pennsylvania law imposes no requirement forcing Appellants to study their policies to make sure all the terms were consistent with Sherman's representations at the time of sale. Nor were Appellants required to perform detailed calculations to determine whether Sherman's representations concerning accumulated values, premium reduction and payout upon death were accurate. *See, e.g., Wilkes, supra* (reversing grant of summary judgment in favor of insurance company where life insurance trust was funded by second-to-die policy and trustee's reliance on vanishing premium sales presentation was reasonable due to inherent policy complexities, and nothing in policy or illustrations sufficiently informed trustee that dividends and accumulated values would be inadequate to allow out-of-pocket premiums to "vanish" by sixteenth year of policy ownership).

¶ 42 To invoke the discovery rule, Appellants were required to exercise that level of diligence which a reasonable person would employ under the facts and circum-

11. *See, e.g.,* Complaint filed at GD–95–16273, at 6 ¶ 12 (indicating that Sherman used the terms "paid up" and "fully funded" as interchangeable and averring that Sherman represented that no further premiums would need to be paid out-of-pocket after the initial years of the MetLife policy), at 28 ¶ 77.a (averring that Sherman represented that **out-of-pocket premium costs** would be reduced and/or eliminated), at 32 ¶ 82 (iterating representations allegedly made by Sherman and Hague concerning the impact on new policy premiums by using accumulated value from converted policies), Complaint filed at GD–95–16273, at Exhibit D (written confirmation by Sherman that out-of-pocket premiums for each of the policies would be paid for a limited number of years, after which no further cash outlay would be required); and Complaint filed at GD No. 96–14270 (asserting similar claims against Sherman, Hague and Manufacturers). *See also* Complaints filed at numbers GD–95–16273, Exhibit C and at GD–95–14270, Exhibit E (comprising illustrations indicating a premium and cash value schedule for whole life policies that do not include an interest rate or explain the method of calculating the cash values).

stances presented in a particular case. *Toy*, 863 A.2d at 7. Under the governing standard, we must resolve all doubts in favor of Appellants, the non-moving parties. *Blumenstock*, 811 A.2d at 1033. In light of the above, we conclude that reasonable minds could differ as to whether Appellants knew or could have known of their alleged injuries within ten days of delivery of the new insurance policies. We therefore cannot agree with the trial court's grant of summary judgment based on its decision that, as a matter of law, the discovery rule cannot apply in this case.

¶ 43 Appellants also claim that the trial court erred in holding, as a matter of law, that they did not justifiably rely on Sherman's representations and, therefore, cannot establish any of their claims of unfair or deceptive acts or practices arising under the UTPCPL. This claim is identical to that presented in *Toy, supra,* where we upheld the trial court's ruling that a plaintiff must demonstrate the common law element of justifiable reliance to sustain a UTPCPL claim. *Id.* 863 A.2d at 11. Whether a plaintiff has sufficiently demonstrated justifiable reliance rests on the following principles:

> It is the fundamental principal of the law of fraud, regardless of the form of the relief sought, that in order to secure redress, the representee must have relied upon the statement or representation as an inducement to his action or injurious change of position. The recipient of a fraudulent transaction can recover against its maker if, but only if, (a) he relies on the misrepresentation in acting or refraining from action, and (b) his reliance is justifiable.

*Id.* Whether the party claiming to have been defrauded relied upon a false representation is a question of fact. *Id.* The rules for determining whether a person's reliance upon a fraudulent misrepresenta-

tion was justifiable have been set forth in the Restatement (Second) of Torts as follows:

### § 540 Duty to Investigate

The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.

### § 541 Representation Known to Be or Obviously False

The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him.

*Toy*, 863 A.2d at 12 (quoting Restatement (Second of Torts) §§ 540, 541). Although the recipient of a fraudulent misrepresentation is not barred from recovery because he could have discovered its falsity by investigating its truth, nonetheless he cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent if he had used his opportunity to make a cursory examination or investigation. *Id.*

¶ 44 In this case, the trial court determined that Appellants could not demonstrate justifiable reliance once they received copies of the insurance policies and failed to examine them. Furthermore, the trial court held Appellants to a "sophisticated investor" standard in determining that they were not entitled to rely on Sherman's representations concerning the validity of "vanishing premium" plans. We have already explained why the trial court cannot rule, as a matter of law, that Drelles is a "sophisticated investor" with regard to insurance specific questions. As we stated in *Toy*, an insured has the right to rely on the representations made by an insurance agent because of the agent's expertise in a "complicated subject." *Id.* at 12. In view of the trust placed in insur-

ance agents, it is "not unreasonable" for consumers "to rely upon the representations of the expert rather than on the contents of the insurance policy itself, or to pass when the time comes to read the policy." *Id.* (internal quotation omitted). Ultimately, policyholders have no duty to read the policy and are entitled to rely upon agent's representations unless the circumstances of the case make it "unreasonable" for them not to read the policy. *Id.* at 12–13.

¶ 45 As in *Toy,* we hold that Appellants' receipt of the policies alone was insufficient to establish, as a matter of law, that they did not rely on Sherman's representations. Due to the complicated nature of insurance transactions, we cannot conclude that Appellants' alleged trust in Sherman was so unreasonable that, as a matter of law, they cannot demonstrate justifiable reliance as required by the UTPCPL. The right to rely upon a representation is generally held to be a question of fact. *Toy,* 863 A.2d at 12. Furthermore, the issue of justifiable reliance cannot be resolved without considering the relationship of the parties involved and the nature of the transaction. *Id.* It is up to a jury to determine whether Appellants justifiably relied upon Sherman's representations to the extent necessary to support their UTPCPL claims.

¶ 46 We are aware of the plethora of federal cases cited by Appellees that hold differently than does *Toy.* However, the Superior Court is not bound by federal court decisions. *Werner v. Plater–Zyberk,* 799 A.2d 776, 782 (Pa.Super.2002), *appeal denied,* 569 Pa. 722, 806 A.2d 862 (2002). Absent a United States Supreme Court pronouncement, the decisions of federal courts are not binding on Pennsylvania state courts, even when a federal question is involved. *Id.* Unless or until *Toy* is overruled, that decision governs our deter-

minations, not the pronouncements on Pennsylvania law made by inferior federal courts.

¶ 47 Orders reversed; case remanded for further proceedings. Jurisdiction relinquished.