Filed 6/26/14  Steelman v. Phoenix Life Ins. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DENNY R. STEELMAN, | |
| Plaintiff and Appellant, | G048383 |
| v. | (Super. Ct. No. 30-2012-00540674) |
| PHOENIX LIFE INSURANCE COMPANY et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Franz E. Miller, Judge.  Affirmed.

Law Offices of Robert K. Scott, Robert K. Scott, James W. Haines; Sina Law Group and Reza Sina for Plaintiff and Appellant.

Edison, McDowell & Hetherington, Thomas F.A. Hetherington, Alana K. Pulaski, and Jodi Swick for Defendant and Respondent Phoenix Life Insurance Company.

Pohls & Associates and Robert R. Pohls for Defendant and Respondent State Farm VP Management Corp.

Winget Spadafora & Schwartzberg, Brandon S. Reif, Timothy W. Fredricks, and Jibraun B. Riaz for Defendant and Respondent Robert Damico.

\*          \*          \*

Twelve years ago, plaintiff Denny R. Steelman and his since-deceased spouse Christine Steelman obtained a joint life insurance policy. Plaintiff thought the policy would pay benefits twice, i.e., upon the death of each spouse. In fact, the policy only paid death benefits upon the first death of either spouse, a fact actually discovered by plaintiff after the death of his wife in 2010. Plaintiff sued the insurance broker who sold him the policy, the broker's employer, and the insurer. The trial court sustained defendants' demurrers to plaintiff's second amended complaint without leave to amend and entered judgment accordingly, largely on statute of limitations grounds. We affirm.

## FACTS[1]

At all relevant times, defendant Robert Damico was a licensed insurance agent and broker who was employed by defendant State Farm VP Management Corp. (State Farm). Damico sold insurance to the Steelmans for several years prior to the

---

[1]      In conducting our de novo review of whether plaintiff "has pleaded facts sufficient to state a cause of action," we "must 'give[] the complaint a reasonable interpretation, and treat[] the demurrer as admitting all material facts properly pleaded.' [Citation.] Because only factual allegations are considered on demurrer, we must disregard any 'contentions, deductions or conclusions of fact or law alleged . . . .'" (*People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 957.)

2

events at issue in this case. The Steelmans trusted Damico and had confidence in Damico's representations and expertise regarding insurance products and investments.

In August 2002, the Steelmans and Damico discussed the Steelmans' existing life insurance policies (which were up for renewal) and the possibility of purchasing "better products that would provide both investment income and life insurance for both of them." At the time, plaintiff was a 57-year-old smoker and Mrs. Steelman was a 56-year-old smoker. Damico presented the "Phoenix Joint Edge Variable Universal Life Insurance Policy" (the Policy),[2] despite the fact that he had been selling insurance products from defendant Phoenix Life Insurance Company (Phoenix) for only two months and had not received training from either Phoenix or State Farm with regard to the Policy. Indeed, this was the first time Damico had ever sold the Policy to any customer. Damico did not provide the Steelmans with other insurance or investment options.

Damico represented the following about the Policy: (1) it was "a variable life insurance product that not only served as an investment vehicle, but also as life insurance coverage for Plaintiff and his wife, regardless of who died first"; (2) "the initial premium for the . . . [P]olicy, plus a rider increasing coverage . . . on Mr. Steelman's life

_____

[2] "[J]oint life insurance" is "[l]ife insurance on two or more persons, payable to the survivor or survivors when one of the policyholders dies." (Black's Law Dict. (7th ed. 1999) p. 805, col. 2.) "Unlike a term life insurance policy, which provides benefits only for a finite period while premiums are being paid, a universal life policy is a form of permanent insurance intended to provide protection for the life of the insured. *Variable* universal life insurance policies combine the premium flexibility of universal life insurance with the investment flexibility of variable life insurance. With variable life insurance, a portion of the premium is allocated to the insurer's investment funds, called subaccounts. Policyholders may move their investments within the subaccounts and the policy's death benefit, which is guaranteed not to fall below a certain amount. With variable universal life, the policyholder may easily invest and alter insurance coverage. The policy is comprised of the policy value, which represents the investment component, and its net amount at risk, which represents the insurance component." (*Norem v. Lincoln Ben. Life Co.* (7th Cir. 2013) 737 F.3d 1145, 1147.)

3

until the age of 95, would be $123,185"; (3) "[t]hereafter, there would be a sole annual premium of $4,900"; (4) "if Mr. Steelman passed away the life insurance proceeds paid by Phoenix . . . would be approximately $550,000 while if Mrs. Steelman passed away the life insurance proceeds paid by Phoenix . . . would be approximately $300,000."

The key allegations in the operative complaint are the following: "Damico did not mention a first to die provision in the Policy and Plaintiff and Mrs. Steelman believed that they were purchasing life insurance coverage for each of them that would remain in force if either of them died." At the time, "Damico was completely unaware that the Policy he sold to Plaintiff had a 'first to die' provision. Therefore, he did not sell the Policy to Plaintiff as such and at no time did he ever communicate to Plaintiff after the Policy was issued that the Policy contained a 'first to die' provision." The second amended complaint is silent as to whether Damico said anything in August 2002 with regard to whether the Policy paid benefits upon the deaths of both of the Steelmans, only the first, or only the second. It appears the Steelmans simply assumed the Policy would pay benefits in the amounts promised upon both of their deaths, regardless of the order.

Based on Damico's representations, the Steelmans purchased the Policy, signing an application the same day they met with Damico (August 26, 2002). The Steelmans also remitted the initial premium of $123,185. Phoenix issued the Policy to the Steelmans, effective October 15, 2002. On March 20, 2003, the Steelmans signed a policy acceptance form and declaration indicating that the information in their applications remained accurate. This document, attached as an exhibit to the operative complaint, noted, "The primary beneficiary is: [¶] Survivor of Said Insureds. [¶] Owners of policy are insureds jointly." Thereafter, the Steelmans paid annual premiums of $4,900 "with the expectation that both Plaintiff and his wife would have life insurance and the Policy would serve as an investment vehicle with a cash value for the future." The Steelmans began with 100 percent of their "money going into a Money Market account. . . . [T]he money was never allocated to the [investment] subaccounts."

4

The terms of the Policy, attached as an exhibit to the operative complaint, are consistent with Damico's representations (e.g., the initial premium amounts, the approximate dollar value for the benefits paid upon the death of either Mr. or Mrs. Steelman, and the fact that the Policy included an investment component).[3] The Policy included an exchange option, which would have allowed the Steelmans to exchange the Policy (while it remained in effect) for new policies (including one on each spouse). The $250,000 term insurance rider included a conversion right, which would have allowed plaintiff to convert the rider (while the Policy remained in effect) into a separate policy that would have remained in effect after the death of Mrs. Steelman.

Of course, the terms of the Policy are inconsistent with the Steelmans' understanding that benefits would be paid upon each of their deaths. On the very first page of the Policy,[4] the following is stated: "FLEXIBLE PREMIUM JOINT VARIABLE UNIVERSAL LIFE INSURANCE POLICY [¶] Insurance Payable at First Death [¶] Premiums Payable Until First Death [¶] The death benefit and other values provided under this policy are based on the rates of interest credited on any amounts allocated to the Guaranteed Interest Account and on the investment experience of the

---

[3] The rider providing for plaintiff's additional $250,000 in term life coverage specifies an *additional* premium starting at $5,796 per year. The record is unclear as to the purpose of the initial $123,185 premium — was this intended as a prepayment of the additional annual $5,796 premium, as an investment, or as both? The second amended complaint states, "The term rider cost started at $5,796 per year and increased each year. The Steelmans only planned to deposit $4,900 per year. The Policy sold by Damico would have never provided for long-term accumulation under this investment strategy because the Steelmans were in a deficit from the very beginning." Because Mrs. Steelman died before plaintiff, her benefit rather than plaintiff's was paid by Phoenix and the Policy terminated. This explains the lack of effort by the parties to explain the interplay of the $123,185 initial premium and the $250,000 term insurance rider.

[4] Just below the signatures of Phoenix executives, which follow a capitalized admonition to carefully review the Policy and an explanation that the Policy may be returned within 30 days for a full refund of premiums paid.

sub-accounts within our Separate Account to which your premiums are allocated. Thus, the death benefit and other values may increase or decrease in amount or duration."

On page 5 of the Policy, a heading states "Policy Termination Upon First Death." Next to this heading is the following: "Upon the first death, all benefits then due and payable under this policy will be paid to the beneficiary. This policy shall then terminate and thereafter have no force or effect." This heading is listed in the table of contents to the Policy and "First Death" is defined in the Policy's definitions section ("The death of the first of the insureds to die"). The phrase "First death" and the concept that the Policy only continues while both insured individuals survived is referenced throughout the Policy.

Phoenix sent annual statements to plaintiff and his wife. The first statement (for the policy period Oct. 15, 2003 through Oct. 14, 2004) indicated under the heading "Policy Specifications" that the "Policy Type" was "Survivorship." Subsequent annual statements identified the "Policy Type" as "1st to Die." Plaintiff *contends* the label "Survivorship" supports his notion that the Policy would pay death benefits to both spouses.[5]

Mrs. Steelman died on August 11, 2010. Plaintiff timely submitted a claim. On August 27, 2010, Phoenix informed plaintiff that the death benefit payable to plaintiff was $305,376.15. Several days later, Phoenix informed plaintiff that the Policy was no longer in effect and had no remaining cash value following payment of the claim.

---

[5] Plaintiff does not explain why this is so. Survivorship insurance, or "'second-to-die' insurance is a form of joint life insurance that pays a death benefit only upon the demise of the second named insured to die." (*Drelles v. Manufacturers Life Ins. Co.* (Pa.Super. 2005) 881 A.2d 822, 827, fn. 2 [such policies are typically used for estate planning purposes as opposed to more typical life insurance functions].) It is unclear from the record whether life insurers even sell joint life policies that pay benefits upon the death of both insured parties.

Plaintiff was shocked by this information.  Plaintiff called Damico, who assured plaintiff the Policy was not a "first to die" policy.  Damico contacted Phoenix representatives and explained that he never intended to sell a "first to die" policy to plaintiff.  Damico further stated that the Policy never would have been purchased had he or the Steelmans known it contained a "first to die" provision.  Damico's remonstrations had no effect.

Based on the reality of the Policy (as opposed to his misunderstanding of its workings), plaintiff alleges the Policy was wholly inappropriate and unsuitable as an investment and insurance package (i.e., "[i]t could easily be demonstrated that an annuity and term insurance would significantly outperform the Steelmans' First-to-Die policy").  Plaintiff faults defendants for not evaluating the suitability of the Policy (a complex financial product) for the Steelmans' needs.  Plaintiff faults State Farm and Phoenix for not properly training and supervising Damico.  Plaintiff cites "substantial commissions from . . . Phoenix" as the motivation for Damico and State Farm to sell the Policy to the Steelmans, thereby placing their interests above those of the Steelmans.

PROCEDURAL HISTORY

The second amended complaint (which sets forth the allegations described above) represents plaintiff's fourth attempt to plead viable causes of action based on his purchase of the Policy.  Plaintiff voluntarily dismissed a prior action filed in November 2011 against Phoenix and Damico.  In January 2012, plaintiff commenced the instant action against all three defendants.  Defendants successfully demurred in part to the initial complaint and the first amended complaint.

Plaintiff filed the second amended complaint in October 2012.  It alleged a negligence cause of action against Phoenix, as well as three causes of action against Damico and State Farm — breach of fiduciary duty, negligent misrepresentation, and

7

professional negligence. All of the causes of action can be categorized into two basic theories of wrongdoing by defendants: (1) plaintiff was misled about what he was purchasing with regard to the first to die component of the Policy, and (2) defendants did not adequately protect plaintiff's interest in selling him the Policy, which was wholly unsuitable for his situation. There is no contention that plaintiff did not receive the benefit of his bargain according to the fair meaning of the Policy as delivered to him by Phoenix in October 2002. There is no contention that there is any ambiguity in the terms of the Policy itself.

The court sustained the defendants' respective demurrers to the second amended complaint. The court ruled that Phoenix did not have a duty to plaintiff with regard to the advisability or adequacy of coverage, or to train Damico. The court also ruled that the causes of action were untimely pursuant to the relevant statutes of limitation because plaintiff should have discovered the alleged basis for his claims at the time he purchased the Policy.

## DISCUSSION

There are two problems with plaintiff's case that, together, doom his allegations against all defendants. We decline to address Phoenix's alleged duties toward plaintiff, as the resolution of this issue is unnecessary to dispose of the appeal.

*Lack of Actionable Misrepresentation*

With regard to the "first to die" issue, plaintiff identifies no misrepresentations of material fact by Damico prior to the death of Mrs. Steelman and the termination of the Policy. Upon careful inspection, the second amended complaint carefully distinguishes what Damico represented to plaintiff in August 2002 with what Damico represented to plaintiff in August 2010. There is no allegation that, at any time

8

prior to the death of Mrs. Steelman and the termination of the Policy, Damico told plaintiff there was no "first to die" clause in the Policy or the Policy would pay benefits twice (i.e., upon the death of both Steelmans). Instead, the second amended complaint alleges that Damico omitted to inform the Steelmans of the "first to die" clause in the Policy. "[S]omething more than an omission is required to give rise to recovery" on a negligent misrepresentation theory. (*Byrum v. Brand* (1990) 219 Cal.App.3d 926, 941.) The allegations in the second amended complaint suggest all of Damico's material representations about the Policy were accurate.

Nor is this a case in which plaintiff subsequently asked Damico about the workings of the Policy and received an inaccurate reply upon which he relied. (See, e.g., *Clement v. Smith* (1993) 16 Cal.App.4th 39, 44-47 [insured may rely on specific responses to inquiries about coverage from selling agent].) Instead, this is a case in which plaintiff formed inaccurate and unrealistic expectations about the contents of the Policy, then apparently failed to read the Policy to see whether these conjectures had any basis. "As the Supreme Court stated in *Sarchett v. Blue Shield of California* (1987) 43 Cal.3d 1, 15 . . . , a court 'must hold the insured bound by clear and conspicuous provisions in the policy even if evidence suggests that the insured did not read or understand them.'" (*Hadland v. NN Investors Life Ins. Co.* (1994) 24 Cal.App.4th 1578, 1589; see *id*. at p. 1581 [reliance on agent's representation that replacement health coverage was "as good if not better" than existing coverage was unjustified as a matter of law].) Plaintiff makes much of Damico's ignorance of the contents of the Policy. For purposes of the negligent misrepresentation claim, this is beside the point, as the only misrepresentations by Damico occurred after the Policy had terminated.

*Statutes of Limitations*

With regard to plaintiff's broader claim that defendants sold him an unsuitable financial product for their own gain, the relevant statutes of limitations

9

preclude recovery. Damico's advice and presentation of the Policy occurred in August 2002. The Policy became effective in October 2002. Sometime thereafter, the Steelmans remitted $123,185 as the initial premium and received a copy of the Policy, which accurately disclosed its insurance and investment features. The Steelmans then received annual statements, describing the status of their insurance and investments. The complaint in this action was filed in January 2012, nearly 10 years after Damico's advice. Regardless of the precise moment at which the statute of limitations might be said to begin (i.e., Oct. 2002 when the Policy became effective, Mar. 2003 when the Steelmans signed a form accepting the Policy, or the first time the Steelmans received an annual policy statement in 2003, 2004, or 2005), each of the possibly applicable statutes have run. (See Code Civ. Proc., §§ 335.1 [personal injury, two years], 337 [written contract, four years], 338, subd. (d) [fraud or mistake, three years], 339 [oral contract, two years], 343 [claim not provided for, including non-fraudulent breach of fiduciary duty, 4 years].)

Plaintiff first contends the statute could not have begun running until appreciable harm occurred. (See, e.g., *Roger E. Smith, Inc. v. SHN Consulting Engineers & Geologists, Inc.* (2001) 89 Cal.App.4th 638, 650-651 [cause of action "does not accrue until the plaintiff (1) sustains damage and (2) discovers, or should discover, the negligence"].) For purposes of this argument, plaintiff identifies his harm as the termination of the Policy when his wife died.[6] But, taking his allegations as true, plaintiff suffered harm immediately when he transferred $123,185 to Phoenix as an initial premium in exchange for the Policy, rather than investing it in a more appropriate way (e.g., annuities and term life insurance). Plaintiff's "argument fails because it 'confuses

---

[6] As noted in State Farm's brief, it is odd to say that defendants harmed plaintiff in August 2010. As a result of Mrs. Steelman's death, Phoenix paid plaintiff $305,376.15. The Steelmans had paid approximately $157,485 over eight years for this death benefit (the initial premium plus $4,900 per year). Certainly, in the prayer for relief, plaintiff does not seek to rescind the Policy and retrieve the premiums in exchange for a return of the $305,376.15.

the distinction between the *fact and knowledge* of damage and the *amount* of damage." (*Id*. at p. 651.) It is true plaintiff could not have known exactly how much was lost as a result of purchasing the Policy; that calculation would depend on any number of factors, including the length of the Steelmans' lives and the actual performance of any investment funds managed by Phoenix. But, according to the theory of the case alleged in the second amended complaint, any financial harm to the Steelmans necessarily started to accrue at the inception of the Policy.

Plaintiff also asserts the delayed discovery rule precludes dismissal on statute of limitations grounds. Plaintiff points to his discovery of the Policy's limitations in August 2010, upon the death of his wife and the termination of the Policy. "The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807.) Plaintiff has failed in his obligation to plead facts demonstrating his diligence. (*Id*. at p. 808 [as to diligence in discovering alleged wrongdoing, "'conclusory allegations will not withstand demurrer'"].) Moreover, we see no way for plaintiff to plead diligence given the other facts already admitted in the second amended complaint and the exhibits attached thereto. Plaintiff was on notice of the terms of the Policy via the Policy itself. He accepted the Policy in writing in March 2003. He thereafter received annual statements noting the status of his insurance and investments. Unlike the primary case relied on by plaintiff (*Dias v. Nationwide Life Ins. Co.* (E.D. Cal. 2010) 700 F.Supp.2d 1204, 1223-1224), there were no representations from Damico or anyone else suggesting the Steelmans would receive the double payout plaintiff expected and viewed as the primary lure of the Policy.

Similarly, we reject plaintiff's assertion that defendants are equitably estopped from relying on a statute of limitations defense. There was no misrepresentation identified in the second amended complaint that could result in such an estoppel. (See *Vu v. Prudential Property & Casualty Ins. Co.* (2001) 26 Cal.4th 1142,

11

1152-1153.)  In sum, we agree with the trial court's ruling that the relevant statutes of limitations preclude recovery in this action.

## DISPOSITION

The judgment is affirmed.  Defendants shall recover costs incurred on appeal.

IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

FYBEL, J.