J-A06035-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JAMES D. NEELY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN (JACK) WADDELL., JR., MONY | : | No. 792 WDA 2022 |
| LIFE INSURANCE COMPANY, AND | : | |
| AXA FINANCIAL INC. | : | |

Appeal from the Order Dated June 29, 2022
In the Court of Common Pleas of Beaver County Civil Division at No(s):
No. 11130-2017

BEFORE:  OLSON, J., NICHOLS, J., and PELLEGRINI, J.*

MEMORANDUM BY PELLEGRINI, J.:              **FILED: MARCH 30, 2023**

James D. Neely (Neely) appeals from the June 29, 2022 order of the

Court of Common Pleas of Beaver County (trial court) entering judgment in

favor of John (Jack) Waddell, Jr. (Waddell), MONY Life Insurance Company

(MONY) and AXA Financial Inc. (AXA) (collectively, the Defendants) following

a non-jury trial on his claims under the Unfair Trade Practices and Consumer

Protection Law (UTPCPL).[1]  He challenges the trial court's pretrial ruling

dismissing the majority of his claims based on the statute of limitations and

_____

* Retired Senior Judge assigned to the Superior Court.

[1] 73 P.S. §§ 201(2)(4)(v), (xxi).

its factual and legal conclusions based on the evidence presented at trial. We affirm.

**I.**

We glean the following facts from the certified record. In August 2017, Neely filed a complaint against the Defendants alleging that in 1987, Waddell, in his employment with MONY,[2] sold him an Individual Retirement Account Alternative (IRAA) promising returns of $29,769 annually after Neely reached age 65 if he paid a premium on the plan through age 65. In 2012, Neely contacted an AXA agent with questions about his plan and was informed that MONY had never offered an IRAA. Through counsel, Neely exchanged several letters with AXA and MONY, which we discuss in more detail *infra*. In the letters, AXA and MONY asserted that the plan Neely had purchased in 1987 was based on dividends which could not be guaranteed. Based on these letters, Neely did not believe AXA and MONY would honor the terms of the plan as set forth in his communications with Waddell in 1987.

Neely filed the instant action in 2017 after he reached age 65. He pled claims of negligent misrepresentation by Waddell, vicarious liability by MONY and AXA, breach of contract and breach of the duty of good faith and fair dealing by MONY and AXA, violations of the UTPCPL by the Defendants and bad faith by MONY and AXA. The Defendants filed answers to the complaint

_____

[2] The complaint further alleged that MONY was acquired by AXA in 2004.

raising the statute of limitations as an affirmative defense. They then filed a motion for judgment on the pleadings arguing that Neely's claims were time barred. Following briefing, the trial court held that all claims save for the alleged violations of the UTPCPL were untimely and granted judgment on the pleadings in part.

The parties ultimately proceeded to a non-jury trial in February 2021. The trial court summarized the evidence and its factual findings as follows:

> On approximately October 27, 1986, Neely met Waddell to discuss options to accumulate money for retirement. Neely knew Waddell because Neely's father had purchased several different policies from Waddell over the years. At the time, Waddell was employed by MONY, formerly known as Mutual of New York and Mutual Life Insurance Company of New York.[4]
>
>> [4] In 2004, MONY was acquired by AXA Financial Inc. and then acquired by Protective Life Insurance Company in 2013.
>
> At the meeting, Neely and Waddell discussed a MONY concept called an Individual Retirement Account Alternative (hereinafter "IRAA").[5] Waddell explained the two parts of the IRAA as the MONYconomizer policy, which provided a guaranteed payout if the policyholder paid the premiums, and the dividend-driven portion, which was not guaranteed. Specifically, Waddell explained that Neely could pay into the IRAA for ten (10) years and start to collect money at age 65, or, if he wanted to receive a larger payment, he could pay into the IRAA for thirty (30) years and start to collect money at age 65. Waddell showed Neely an IRAA brochure that provided that if Neely paid $145 per month for thirty (30) years, Neely would receive $29,796 per year, commencing at age 65.
>
>> [5] The IRAA concept was created and presented in a meeting by Bob Jamieson at Jerry Urbik's [MONY] agency in Chicago. Richard Dale Abshire testified that the IRAA was a sales program that [MONY] developed in the early '80s and that he sold IRAAs when he worked for [MONY].

On the same date, October 27, 1986, Neely filled out and signed an application for the "MONYconomizer" policy, which did not mention an IRAA. At this time, Neely understood dividends were not guaranteed and that the dividends in the IRAA could fluctuate. On January 7, 1987, and January 8, 1987, Neely underwent a required medical examination for the Policy.

On January 28, 1987, the Policy was issued under Policy Number 1188-31-71 R. 12. The Policy itself provided that it was a whole life policy with a $125,000 initial death benefit and several growth option riders for dividends. The Policy set forth specific language that it is a "Whole Life Policy" and that dividends "are neither guarantees nor estimates for the future." On February 4, 1987, Neely signed the Policy Receipt Notice. Neely reviewed parts of the Policy, specifically the cover sheet, and the IRAA when he received it.

On February 10, 1987, in response to Neely's request for certain documents, Waddell sent Neely a letter specifically providing that:

> Per our discussion, you asked that I outline exactly what the IRAA plan can do for you.
>
> Enclosed is the information concerning the plan assuming that it is paid for the specific 10 years. At age 65 this will pay out $15,000 per year for 15 years with a balance left at that point, age 8[0], of $121,734.
>
> Also, enclosed is material which I prepared to outline the benefits should you decide after 10 years that you wish to continue to pay the premium on your plan and deposit the money through age 65. As you can see, at age 65 the pay out for 15 years would be $29,769 annually. The choice would be yours once you get through the 10 year period.

The letter enclosed the 10-year IRAA, the Pay to Age 65 IRAA, and the Variable Pay Statement. The Variable Pay Statement provided that Neely would receive $29,769 per year commencing at age 65 until age 80. The letter and both IRAAs provided as enclosures did not use the terms "MONYconomizer" or "whole life policy." The enclosures, however, provided language that the dividends were not guaranteed.[21] While Neely never read any of the documents in their entireties, Neely confirmed that he did, in

fact, read the disclaimers that dividends were not guaranteed and understood that the dividends could fluctuate. He specifically understood that the $29,769 per year payment provided on the Variable Pay Statement was not guaranteed and that the dividends could fluctuate.

> [21] The IRAAs do not define the term "current scale" used in the disclaimer.

The Policy required either an annual premium of $2,026 or a MONY-matic monthly premium of $145. Neely authorized MONY to automatically withdraw $145 per month from his checking account.

Since the Policy was initiated, Neely completed four (4) dividend withdrawals on February 26, 1992; April 2, 1992; February 24, 1993; and February 8, 1994, totaling $1,016.88. Neely also took out a loan in the amount of $13,999.53 on November 15, 1995. On January 31, 2002, Neely paid back the loan in full with interest. On December 30, 1988 and March 4, 1998, Neely did not provide good checks to MONY for the Policy and failed to pay premiums for several months before paying the premiums back by cash. Neely understood that the failure to pay premiums would have an effect on the dividends for the Policy. Similarly, the loan would also have an effect on the dividends for the Policy.[31]

> [31] Neely testified that the loan would not "have a big impact" on the dividends in the Policy. Bill Childers, Plaintiff's expert, opined that the loan would not affect the dividends since it was against the cash value of the Policy. On the contrary, Betty D'Arrigo, MONY's corporate designee, opined that the loan would affect the dividends in the Policy. The Court finds D'Arrigo's testimony and explanation credible.

After paying the premiums for approximately ten (10) years, testimony revealed that Neely wished to continue to pay the premiums until age 65. In approximately March or April of 1998, Neely paid by check monthly for the remainder of 1998 and then converted to an annual premium for 1999. Neely has continued to pay an annual premium of $1,673.06, not the $2,026.00 indicated in the IRAA documents.[34]

<sup>34</sup> The Variable Pay Statement provides annual premiums of $2,026 for ten (10) years and then $1,348 thereafter while the IRAA Pay to Age 65 provides an annual premium of $2,026 to age 65, which is consistent with the February 10, 1987 letter. Furthermore, the Variable Pay Statement provides that regardless of the premium, at age 65, the pay out was $29,769.

In approximately 2003, Neely added his wife, Wenyu Zuo Neely, to the Policy as a beneficiary.

In 2012, Neely met with an AXA Agent to review the Policy where the Agent informed Neely that he was not familiar with an IRAA. After speaking with the AXA Agent, Neely spoke with an attorney who sent a letter to Waddell and AXA on September 4, 2012. At a deposition, Betty D'Arrigo (hereinafter "D'Arrigo"), a corporate designee for MONY, also stated that she was not aware of MONY ever offering an IRAA. However, Richard Dale Abshire (hereinafter "Abshire"), Plaintiff's witness, provided testimony at a deposition to the contrary. Abshire testified that the IRAA was a sales program that [MONY] developed in the early '80s. Abshire testified that he sold IRAAs when he worked for [MONY]. Notably, Abshire thought the dividends and illustrations in the IRAA were acceptable and that it was a legitimate concept.

Neely, currently 69 years old, continues to pay the premium and has not received any payment to date. As of January 27, 2021, the Policy includes a net death benefit of $218,344.82 and a net cash value of $119,703.51. The non-payment from the Policy has resulted in the action under [UTPCPL] by the Plaintiff. The non-jury trial occurred on February 7-8, 2022 before the Court.

At trial, Neely testified regarding his recollection of the October 27, 1986 meeting and his understanding of the Policy. The Court notes that there were several inconsistencies throughout Neely's testimony. For instance, when being questioned concerning his Interrogatory responses, Neely struggled to answer the question of whether he read the Policy when he received it, ultimately testifying that he read the cover sheet of the Policy, which provided that it was a "WHOLE LIFE POLICY." The Court does not find Neely's testimony credible. Regardless of whether Neely read the Policy, Neely received the Policy, which included on at least three pages the specific language that "Dividends shown are based upon the 1987 scale and are neither guarantees nor

estimates for the future." Furthermore, Neely receives premium statements, current death benefit information, and current cash surrender value information, which he can review for the Policy.

Again, while there were inconsistencies throughout Neely's testimony, this Court finds that Neely understood that the dividends were not guaranteed and that the dividends could fluctuate. As previously mentioned, at the time of the meeting, testimony revealed that Neely understood dividends were not guaranteed and that the dividends in the IRAA could fluctuate. Neely further confirmed that he read the disclaimers that dividends were not guaranteed and understood that the dividends could fluctuate. He specifically understood that the $29,769 per year payment provided on the Variable Pay Statement was not guaranteed and that the dividends could fluctuate, as explained by the disclaimer on the same page as the projection. As indicated above, every document accompanying the letter, the Variable Pay Statement and both IRAAs, provided disclaimers that dividends were not guaranteed.[54] Finally, Neely understood that the failure to pay premiums would have an effect on the dividends for the Policy.

[54] See Exhibits 3 and 4 (The following language is provided in two sections: "Note: Projected dividend values are based on the current scale and are not guaranteed."). See also Exhibit 5 (The following language is provided in three sections: "Page four of this illustration shows the allocation of premiums, death benefits and cash values between the base policy and Growth Option Rider. This illustration shows the surrender of values dependent in whole or in part on dividends paid by the Company. These values are not guaranteed.").

Waddell, currently 87 years old, also testified at trial. Waddell testified that he met with Neely in 1986 to discuss options for Neely's retirement. Waddell recalled discussing and explaining the IRAA concept with Neely. Specifically, Waddell explained the IRAA as follows:

I many times would say to him, "This is like a motorcycle. You've got the basic driving engine in this thing plus you've got a sidecar, and the sidecar helps accumulate the money. This side of its driven by a MONYCONOMIZER policy right here." Many times this is how I do it. It was right there.

> That is guaranteed. You pay that premium from this point to this point to this point to this point, and this column is going to tell you exactly what it's worth, exactly.
>
> Now, the sidecar, if you want to do it, is dividend driven. Dividends never have been guaranteed. Mutual companies don't guarantee them. They are projected based on a current dividend scale, and the two of them move, and hopefully they move together towards that.

When questioned about the performance of the IRAA, Waddell confirmed that he did not calculate the rate of return on the investments for the IRAA. Waddell further confirmed that at some point, he probably realized that the investments would not perform as indicated in the documents and does not recall contacting Neely to inform him of this realization. Waddell agreed that the Pay to Age 65 IRAA did not do exactly what Waddell provided in the February 10, 1987 letter. While the letter could have provided more detail concerning the dividends, the letter's enclosures along with Waddell's explanation of the IRAA at the meeting, provided Neely with the relevant dividend information for the Policy. Give the testimony provided above, the Court finds Waddell's testimony to be consistent and credible.

At trial, both parties submitted additional evidence, such as deposition transcripts and expert reports, for the Court's review. After reviewing the exhibits, the Court finds that Waddell's illustrations of the dividend projections were accurate at the time they were created. While the Court notes that Bill Childers (hereinafter "Childers"), Plaintiff's expert, set forth several opinions with regards to liability against Defendants concerning the IRAA, the Court does not agree. First, Childers opined that an IRAA is not a legitimate retirement investment plan. Childers also stated that the February 10, 1987 letter is misleading in that it does not indicate that dividends are not guaranteed. Childers indicated that the loan would not affect the dividends since it was against the cash value of the Policy. Lastly, Childers opined that the IRAA did not have sponsorship or approval of MONY, the IRAA did not have uses or benefits that Waddell represented it did, Waddell advertised the IRAA as a retirement plan, and Waddell acted in a deceptive manner with regards to the whole life insurance policy and the IRAA. On the contrary, Abshire, a former employee of [MONY], testified that he thought that the IRAA was a legitimate concept and the dividends and illustrations in the

- 8 -

IRAA were acceptable. Furthermore, Michael Conwill (hereinafter "Conwill"), Defendants' expert, opined that the IRAA was a legitimate policy and Waddell's illustrations accurately reflected MONY's then current dividend scale. Conwill indicated that the reduction in interest rates industry wide from 1987, and Neely's own conduct of withdrawing dividends at the time he did, had a significant impact on the Policy. Given Abshire's testimony and Conwill's expert report, the Court finds that Waddell's projections for dividends were truthful when they were generated in 1986.

Findings of Fact & Conclusions of Law, 4/26/22, at 2-8 (cleaned up, citations omitted). The trial court concluded that the Defendants had not violated the UTPCPL because the IRAA had the approval and sponsorship of MONY, the benefits and uses were accurately described in the documents and by Waddell, and that the policy documents included conspicuous disclaimers that dividends could not be guaranteed. *Id.* at 9. It further concluded that Neely had not proven that the Defendants acted fraudulently in violation of the UTPCPL. *Id.* at 10. Accordingly, it found in favor of the Defendants on all claims.

Neely filed post-trial motions which were denied. He timely appealed and he and the trial court have complied with Pa. R.A.P. 1925.

## II.

Neely's first claim on appeal challenges the trial court's pretrial ruling on the Defendants' motion for judgment on the pleadings.[3] The trial court

---

3

When reviewing a trial court's order sustaining judgment on the pleadings, our standard of review is to determine whether, based on the facts the plaintiffs pled, the law makes recovery impossible. A judgment on the pleadings will be granted where, on the facts

dismissed Neely's claims of negligent misrepresentation, vicarious liability, breach of contract, breach of the duty of good faith and fair dealing and bad faith based on the statute of limitations. The trial court held that these claims accrued in 2012 when Neely contacted MONY and AXA representatives regarding the IRAA. At that time, he was informed that dividends on his policy were not guaranteed and that he would not receive the anticipated returns of $29,769 annually upon reaching age 65. Accordingly, the trial court held that the claims accrued at that time and that the two- and four-year statutes of limitations had passed before Neely filed suit in 2017. Neely argues that because he was not eligible to receive returns until he reached age 65, his claims did not accrue until that date. Because he filed suit shortly after his 65th birthday, he contends that his claims were timely.

"In Pennsylvania, a cause of action accrues when the plaintiff could have first maintained the action to a successful conclusion." *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005) (citation omitted); 42 Pa.C.S. § 5502(a) ("The time within which a matter must be commenced under this chapter shall be

---

averred, the law says with certainty that no recovery is possible. We regard as true all well-pleaded allegations in [Plaintiff's] pleadings, as [he] is the non-moving party, and consider against [him] only those factual allegations in the [Defendants'] pleadings that [he] has admitted.

*Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237, 244 (Pa. 2021) (citations omitted).

computed . . . from the time the cause of action accrued. . . .").  The discovery rule tolls the statute of limitations "until the plaintiff knows, or in the exercise of reasonable diligence should have known, that he/she has been injured and that her injury was caused by another's conduct."  ***Toy v. Metro. Life Ins. Co.***, 863 A.2d 1, 7 (Pa. Super. 2004), *aff'd*, 928 A.2d 186 (Pa. 2007).  Once the plaintiff has discovered the injury, he has an affirmative duty to protect his own interests and pursue his remedy within the statute of limitations. ***Id.*** "Mistake, misunderstanding, or lack of knowledge in themselves do not toll the running of the statute."  ***Drelles v. Manufacturers Life Ins. Co.***, 881 A.2d 822, 831 (Pa. Super. 2005) (citation omitted).

Here, the claims of negligent misrepresentation, vicarious liability[4] and bad faith are subject to a two-year statute of limitations, 42 Pa.C.S. § 5524(7); ***Ash v. Continental Ins. Co.***, 932 A.2d 877, 885 (Pa. 2007), while the breach of contract and breach of the duty of good faith and fair dealing claims are subject to a four-year statute of limitations, 42 Pa.C.S. § 5525(a)(8).

We have previously determined that a bad faith insurance action accrues upon the denial of coverage and litigants "may not separate initial and continuing refusals to provide coverage into distinct acts of bad faith."

---

[4] The vicarious liability claims against AXA and MONY were based on those entities' alleged liability for the negligent misrepresentation claim against Waddell.

- 11 -

*Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1042 (Pa. Super. 1999). Similarly, in *Toy*, *supra*, we held that a negligent misrepresentation claim based on presenting a life insurance product as a retirement fund was subject to a two-year statute of limitations that began to run when the plaintiff purchased the policy, as she failed to exercise due diligence to review her policy and discern that she had not received the product which she had expected. In *Toy*, the plaintiff was told she would receive returns in excess of $100,000 if she invested in her plan monthly until age 65. She ceased payments after learning about the true nature of the insurance policy when she was still in her forties.

An anticipatory breach of a contract gives rise to a cause of action upon proof of an "absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so." *2401 Pa. Ave. Corp. v. Fed. of Jewish Agencies of Greater Phil.*, 489 A.2d 733, 736 (Pa. 1985) (citation omitted). Breach of the duty of good faith and fair dealing is a species of contract claim and subject to the same statute of limitations. *See Kaplan v. Cablevision of PA, Inc.*, 671 A.2d 716, 721-22 (Pa. Super. 1996) ("Every contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." (citation omitted)).

In his complaint, Neely set forth the history of his communications with MONY and AXA and averred that "MONY/AXA has made it clear that it does not intend to honor the IRAA which Neely purchased." Complaint, 8/29/17,

at ¶ 34. In support, he attached letters he exchanged with MONY in 2012 to the complaint. Neely had provided MONY with the documentation he received from Waddell in 1987 and requested that it "put a vehicle in place which will pay [him] $29,769.00 a year for fifteen years beginning on his 65th birthday." *Id.*, Exhibit E (Letter, 9/4/12). In response, MONY stated that "The concept upon which Mr. Neely may have purchased this policy is based on dividends. Dividends cannot be guaranteed." *Id.*, Exhibit F (Letter, 11/1/12). It further explained that the IRAA's performance could have been affected by loans Neely took from the account in the past, his failure to pay premiums as originally outlined and failure of the dividends to perform as projected in 1987. MONY indicated that a one-time withdrawal of $29,769 may be available on Neely's 66th birthday, but again stated that any illustrations were based on dividends and could not be guaranteed. *Id.*

Neely responded by denying that he had ever taken withdrawals or loans from the policy and requested that MONY confirm whether it had ever offered the IRAA product as described by Waddell. *Id.*, Exhibit G (Letter, 11/13/12). In response, MONY stated that it did not have documents related to the loans as they were over seven years old, but that Neely had repaid the loans in 2002. *Id.*, Exhibit H (12/7/12). Additionally, it explained:

> MONY Life Insurance Company of America offered a concept referred to as the Income Funder Concept whereby dividend and Growth Option Rider cash values are allowed to accumulate to the point that they might become sufficient to pay the annual premium due and possibly provide an annual income. The concept

was not guaranteed because it is dependent on dividends which cannot be guaranteed.

*Id.* Based on these communications, Neely concluded that MONY would not honor the policy based on the projections set forth by Waddell in 1987.

The trial court concluded that Neely's claims accrued, at latest, on December 7, 2012, the date of MONY's final letter explaining that his expected retirement income was based on dividends that were not guaranteed. Neely argues that none of his claims accrued until he turned 65 years old, as he was not entitled to recover any of the projected returns on the policy until that date. He claims that his suit would have been dismissed as premature if he had filed prior to his 65th birthday.

Neely's argument is directly undermined by *Toy*, where this Court found that the statute of limitations on the plaintiff's negligent misrepresentation claim against her insurance provider expired long before she was entitled to returns under her policy. Even if Waddell did negligently misrepresent the expected returns on the IRAA to Neely during their conversations in 1987, by his own admission, Neely became aware that the fund was not performing as projected, at latest, in 2012. As *Toy* and *Drelles* demonstrate, a claim of negligent misrepresentation against an insurance provider may accrue when the policy is delivered to the insured and he accepts it rather than when projected returns were set to materialize.

Though we acknowledged in *Drelles* that the discovery rule could toll the statute of limitations in similar circumstances, we still concluded that suit

- 14 -

could be brought when the insured discovered the alleged misrepresentation, even if that occurred before he would be entitled to any returns. **Drelles**, **supra**, at 834. Similarly, in **Adamski**, **supra**, we held that a bad faith claim accrues after the initial denial of coverage and cannot be revived by additional requests by the insured.[5] While Neely insists that his suit would have been dismissed if he had filed prior to his 65th birthday, he has not cited any law in support of his contention and we have uncovered none. Accordingly, his negligent misrepresentation, vicarious liability and bad faith claims accrued in 2012 when he learned that his policy had not generated the returns Waddell had projected in 1987 and that MONY and AXA would not pay him the anticipated dividends. Because he filed suit well after the two-year statute of limitations had expired, the trial court correctly dismissed the claims.

Similarly, his contract-based claims fail because MONY and AXA informed him explicitly and unequivocally in 2012 that the policy had not accumulated sufficient dividends to pay him $29,769 annually for 15 years once he reached the age of 65. To the extent that Neely believed his policy constituted a contract guaranteeing him those funds, MONY and AXA

_____

[5] Neely argues that counsel's letter requesting that MONY "put a vehicle in place" to pay him in accordance with the original projections was not a demand that triggered a formal refusal of coverage under **Adamski**, **supra**. Neely's Brief at 12. This argument is mere semantics. The letters exchanged between counsel and the Defendants in 2012 clearly demonstrate that Neely believed he was guaranteed and entitled to the returns that Waddell had initially projected, and that the Defendants were obligated to pay him in accordance with those projections. The Defendants rejected that interpretation.

repudiated the contract and expressed their intent not to comply with the terms, at latest, in 2012. Neely was required to pursue his contract-based claims within the four-year statute of limitations of that alleged anticipatory breach. **See 2401 Pa. Ave. Corp.**, **supra**. As he failed to do so, he is entitled to no relief.

**III.**

The remainder of Neely's claims challenge the trial court's legal rulings and factual conclusions following his non-jury trial.[6]

_____

6

> Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of the jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue . . . concerns a question of law, our scope of review is plenary.
>
> The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.
>
> The trial court, as the finder of fact, is free to believe all, part or none of the evidence presented. Issues of credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determination or substitute our judgment for that of the fact finder.

## A.

First, Neely argues that the trial court abused its discretion in granting the Defendants' motion *in limine* and limiting the testimony of Dale Abshire (Abshire).[7]  Abshire was a former MONY employee who had sold IRAAs for the company around the time that Neely purchased the product.  He did not personally work with Waddell or Neely and learned about their transaction during the course of litigation.  The Defendants characterized Abshire as a disgruntled ex-employee and sought to exclude his testimony based on lack of personal knowledge.[8]  The trial court ultimately limited his testimony to

_____

*Gamesa Energy USA, LLC v. Ten Penn Ctr. Assocs., L.P.*, 181 A.3d 1188, 1191-92 (Pa. Super. 2018), *aff'd*, 217 A.3d 1227 (Pa. 2019) (citations omitted).

[7] The parties deposed Abshire, who was a witness for Neely, during discovery, but Abshire did not testify at trial.  The Defendants admitted the redacted deposition transcript as an exhibit after the trial court issued its ruling on the motion *in limine.*  While Neely appended a portion of the unredacted testimony to his brief, he did not properly seek to have the unredacted transcript included in the certified record on appeal.  *See* Pa. R.A.P. 1926(b); *Commonwealth v. Holston*, 211 A.3d 1264, 1276 (Pa. Super. 2019) (citation omitted) ("Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty.").  Accordingly, we consider only the redacted transcript that was admitted at trial and included in the certified record in our review.

[8] Neely asserted in the trial court and his brief on appeal that the Defendants waived any objections to Abshire's testimony by failing to raise them during the deposition or question Abshire at that time regarding his alleged biases.  N.T., 2/3/22, at 13-14; Neely's Brief at 16.  The Defendants contended that they did raise those issues at the deposition.  N.T., 2/3/22, at 13-14.  Because Neely did not enter the full deposition transcript into evidence or include it in

information Abshire knew about the IRAAs at the time of Neely's transaction.[9]

Neely contends that the trial court should have admitted all of Abshire's testimony, and that it took portions of the testimony out of context when it reached its factual conclusions.

Neely's argument focuses on the relevance of the excluded portions of Abshire's testimony in which Abshire apparently said that none of the IRAAs MONY sold ever paid out the expected dividends, that MONY knew the returns were not viable, and opined that the policy was a "Ponzi scheme." Neely's Brief at 14-17. "Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa. R.E. 401. In addition to relevance, a lay witness's testimony is limited to those matters of which he has "personal knowledge."[10] Pa. R.E. 602. Based on these principles, the trial court limited Abshire's testimony to information he had regarding Neely's specific policy and whether MONY knew at the time it sold the IRAAs that they would be unable to pay the dividends as calculated.

_____

the certified record on appeal, *see* note 7, *supra*, we are unable to assess his claim, and it is waived.

[9] We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. ***Czimmer v. Janssen Pharm., Inc.***, 122 A.3d 1043, 1058 (Pa. Super. 2015).

[10] Neely does not contend that Abshire was an expert witness. ***See*** Pa. R.E. 703.

The trial court did not abuse its discretion in limiting Abshire's testimony in this way. Neely does not argue that Abshire was involved in the sale of the policy at issue in this case. Abshire's testimony established that the IRAA was a product MONY had created in the 1980s to sell whole life insurance policies with a Growth Option Rider (GOR), which it referred to as a MONYconomizer policy that could accumulate cash dividends over the life of the policy. At the time, Abshire and others at MONY believed that the dividend projections were legitimate. He personally sold "dozens" of IRAAs and the agents and brokers he managed sold "hundreds." Defense Exhibit I, Deposition of Dale Abshire, 2/23/21, at 37. All of this testimony was relevant to the UTPCPL claims, namely, whether the Defendants acted fraudulently in selling the policy and whether the concept had MONY's approval or sponsorship. Abshire's opinions regarding the later pay-outs from these policies, or lack thereof, were not relevant to determining whether the Defendants violated the UTPCPL by selling the policies based on the information they possessed in 1987.

The remainder of Neely's argument assails the factual conclusions the trial court drew from Abshire's testimony. Our well-settled standard of review prevents us from disregarding the trial court's factual findings and credibility determinations which are supported by the transcript of Abshire's testimony. *See Gamesa Energy USA, LLC*, *supra*. No relief is due.

**B.**

Next, Neely asserts that the trial court erred in holding that the IRAA had the approval or sponsorship of MONY. He contends that the IRAA was never a legitimate MONY product and Waddell violated the UTPCPL by representing it as an investment vehicle offered by MONY. He argues that the trial court's conclusion contradicts the testimony of Betty D'Arrigo (D'Arrigo), MONY's corporate designee,[11] and the Defendants' response to his first request for admissions in discovery. He believes that the Defendants are bound by the statements set forth in those sources. Neely's Brief at 18-19.

The UTPCPL prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." 73 P.S. § 201-3(a). Relevant to the instant claim, "[u]nfair methods of competition and unfair or deceptive acts or practices" includes "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have." 73 P.S. § 201-2(4)(v).

Upon our review of the record, the alleged confusion over whether MONY offered an "IRAA" product in 1987 appears to be based on differing

---

[11] Like Abshire, D'Arrigo was deposed in discovery and the transcript of her deposition was introduced at trial.

terminology witnesses used to refer to the same investment product. In her deposition, D'Arrigo, who had worked for MONY for 40 years, testified that MONY had offered an "Income Funder" investment tool that was similar to the product Waddell described in his letters to Neely in 1987. Exhibit 14, Deposition of Betty D'Arrigo, 10/18/19, at 16-17. She explained that a GOR attached to a whole life policy allows a client to deposit additional money for investment over the life of the policy, but she had not heard of an IRAA specifically. *Id.* at 22-24. Waddell and Abshire both testified that MONY introduced a whole life policy with a GOR intended to generate retirement income in the 1980s and that they sold that product to numerous clients.

The admissions that the Defendants filed early in the case's history state that "MONY never offered a product that was known as an "Individual Retirement Account Alternative (IRAA)." Objections and Responses to Plaintiff's First Request for Admission and Interrogatories Directed to All Defendants, 7/27/18, at 7. However, Defendants went on to explain that

> MONY offered a concept referred to as an Income Funder Concept or MONYconomizer whole life policy, whereby dividend and Growth Option Rider cash values could accumulate to the point that they might become sufficient to pay the annual premium due and possibly provide an annual income (but could not be guaranteed because such concept was dependent on dividends which could not be guaranteed). To the extent any documentation other than the Policy refers to an "Individual Retirement Account Alternative" or "IRAA Plan," such reference was for illustrative purposes only.

*Id.*

Finally, this verbiage was substantiated by the policy documents that were admitted at trial. The illustrations of projected returns for the policy that Waddell sent to Neely in 1987 with the IRAA brochures state that they "show[] the allocation of premiums, death benefits and cash values between the base policy and **Growth Option Rider**." Exhibit 5 (emphasis added). The policy application form signed by Neely and Waddell has a checkmark next to "Sched. Prem. GO" and the words "GO Rider" handwritten on the bottom. Exhibit A. Annual premium bills sent to Neely from 2007 through 2019 include a line item for the "GO-Rider Cash Value" and "Dividend Additions Cash Value" of the policy. Exhibit C. Finally, the policy delivery receipt dated January 28, 1987, and signed by Neely includes a box checked next to "Scheduled Premium Growth Option Rider Issued." Exhibit D (unnecessary capitalization omitted).

The foregoing demonstrates that whether it was referred to as an IRAA or a whole life policy with an income funder or GOR component, the investment tool was the same. The trial court was entitled to view this voluminous evidence and conclude that MONY had offered the investment vehicle Waddell sold to Neely in 1987. Thus, the plan had the sponsorship or approval of MONY, and Neely could not establish that the Defendants had violated the UTPCPL by representing an illegitimate retirement account as a MONY product.

While Neely repeatedly insists that MONY is "bound" by D'Arrigo's deposition testimony and its answers to the requests for admission, this argument disregards that the *trial court* makes all factual findings at a non-jury trial and that it is entitled to believe all, part or none of a party's evidence.[12] **Gamesa Energy USA, LLC**, **supra**. His assertions that the trial court assigned the incorrect weight to testimony by D'Arrigo, Abshire, Waddell and his expert witness, Bill Childers, is similarly meritless, as the trial court's conclusions are supported by the record. This claim is meritless.

**C.**

Next, Neely argues that the trial court erred by holding that he was required to prove "fraudulent" conduct by the Defendants rather than the lower standard of "deceptive" conduct for his claim under the UTPCPL's catch-all provision. The current catch-all provision of the UTPCPL states that "[u]nfair methods of competition and unfair or deceptive acts or practices" includes "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi). The provision was amended in 1996 to prohibit deceptive conduct but previously allowed for relief only upon a showing of fraudulent conduct,

---

[12] Moreover, as explained *supra*, D'Arrigo's testimony simply did not establish that an IRAA plan, as described by Neely and Waddell, never existed. Neely's argument is based on selective and incomplete citing of her testimony and the Defendants' answers to the requests for admission.

which this Court construed to mean common law fraud. ***See Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC***, 40 A.3d 145, 151-52 (Pa. Super. 2012) (explaining history of the catch-all provision). Because his claims were based on conduct that allegedly occurred in 1986 and 1987, the trial court held that Neely was required to prove fraud under the then-effective version of the statute. We agree.

The Statutory Construction Act includes a presumption against retroactive effect of a statute. 1 Pa.C.S. § 1926 ("No statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly."). This Court previously applied this presumption in holding that the amendment to the catch-all provision of the UTPCPL does not apply retroactively. ***Yenchi v. Ameriprise Financial, Inc.***, 123 A.3d 1071, 1083 (Pa. Super. 2015), *rev'd on other grounds*, 161 A.3d 811 (Pa. 2017). In ***Yenchi***, the alleged deceptive conduct took place less than a year prior to the amendment's passage and effective date. ***Id.*** Nevertheless, we concluded that the plaintiffs were bound to litigate their claim under the version of the provision in effect at the time of the alleged deceptive conduct. ***Id.***; ***see also Richards v. Ameriprise Financial, Inc.***, 152 A.3d 1027, 1035 (Pa. Super. 2016) (applying pre-amendment catch-all provision to claim based on policy that was issued in 1994).

Here, Neely's complaint supported the UTPCPL claims by averring that the Defendants were "fraudulent and/or deceptive" in representing the

projected returns of the IRAA policy as $29,769.00 per year after he turned 65, even though they knew they would not pay him those returns. Complaint, 8/29/17, at 12. That conduct occurred in 1986 and 1987, well before the catch-all provision was amended. Accordingly, the trial court did not err in holding that he was required to prove fraudulent conduct under the pre-1996 version of the UTPCPL.

Relying on **Gregg v. Ameriprise Financial, Inc.**, 245 A.3d 637 (Pa. 2021), Neely claims that because the UTPCPL is a strict liability statute with a remedial purpose of protecting consumers in the marketplace, the trial court should have allowed him to prove that Waddell acted deceptively in selling him the IRAA product in 1987. In **Gregg**, our Supreme Court considered whether the "deceptive conduct" provision included a scienter requirement and concluded that it did not. **Id.** at 647. In so holding, it considered the legislative history of the statute and the 1996 amendment and concluded that the Legislature intended to prohibit conduct that has a "tendency or capacity to deceive" regardless of the actor's intent. **Id.** at 649 (citation omitted). Contrary to Neely's suggestion, the Court did not address whether the 1996 amendment was retroactive—nor was it required to, as the claims therein arose in 1999. **Id.** at 641. Accordingly, **Gregg** has no bearing on the retroactivity of the 1996 amendment of the catch-all provision.

Neely also contends that **Boehm v. Riversource Life Ins. Co.**, 117 A.3d 308 (Pa. Super. 2015), suggests that the amendment to the catch-all

- 25 -

provision applies retroactively. There, the plaintiffs brought UTPCPL claims based on an insurance policy they originally purchased in 1986 and replaced with a new product from the same company in early 1996. In analyzing the claims under the catch-all provision, this Court stated "[b]ecause the transaction at issue here occurred before the 1996 amendments to the UTPCPL catchall provision permitting a claim for deceptive conduct, the plaintiffs had to establish the elements of common law fraud." *Id.* at 321. Neely inexplicably fails to acknowledge this portion of the decision in his argument, instead relying on a footnote to argue that the plaintiffs would have been permitted to proceed under the deceptive conduct standard if they had raised the issue in the trial court. Neely's Brief at 23 (quoting *Boehm*, *supra*, at 321 n.5 ("Appellees argue that the post–1996 amended version of Section 201–2(4)(xxi) should apply because they instituted suit after it took effect. However, it was never disputed in the trial court that appellees had to prove all the elements of common law fraud.")). This Court, however, expressly rejected that argument in *Yenchi* and *Richards*. This claim is meritless.

## D.

In his next argument, Neely contends that even under the pre-amendment version of the catch-all provision, the trial court erred in finding that Waddell did not act fraudulently in explaining the concept of the IRAA and misrepresenting the potential returns. This claim does nothing more than restate the factual arguments he made to the trial court and assail its

credibility determinations. As explained *supra*, the trial court, sitting as fact-finder, was entitled to weigh and assess all evidence and determine the credibility of the various witnesses in reaching its factual conclusions. *Gamesa Energy USA, LLC*, *supra*. When the trial court's findings are supported by competent evidence, this Court may not second-guess them on appeal. Here, the trial court view Waddell's testimony at trial and found him to be "consistent and credible." Findings of Fact & Conclusions of Law, 4/26/22, at 8. Conversely, based on his evasiveness and inconsistent answers, the trial court did not find Neely credible. *Id.* at 6. Because these determinations are supported by the record, we will not disturb them.

**E.**

Neely's final two arguments challenge the trial court's interpretation of the disclaimer language in the IRAA policy and we address them together. First, he argues that the trial court erred by "finding that the disclaimer language in the IRAA was valid." Neely's Brief at 27. He criticizes the disclaimer language in the IRAA documents: "Projected values are based on current scale and are not guaranteed." *Id.* He does not cabin this argument with any citation to legal authority or even to either of the specific UTPCPL claims at issue in this case. Because he has failed to develop this claim with citation to pertinent authority or even explain its relevance to the UTPCPL claims, it is waived. *See* Pa. R.A.P. 2119(a); *J.J. DeLuca Co., Inc. v. Toll Naval Assocs.*, 56 A.3d 402, 411 (Pa. Super. 2012).

Next, Neely claims that the trial court erred by concluding that "whether or not [he] read the policy, the policy contained disclaimer language." Neely's Brief at 29. While he cites to case law explaining that an insured is entitled to rely on his insurance agent's representations about a policy and has no duty to read the policy himself, he again does not explain how this precept relates to either of the claims he brought under the UTPCPL. *Id.* at 30 (citing *Drelles*, *supra*, at 835-36).

To the extent that Neely is arguing that the disclaimer language was too vague and ambiguous to allow him to understand that the projected returns could not be guaranteed or that he never reviewed this language in the first instance, these claims are meritless and belied by his own testimony at trial. After hearing their respective testimony, the trial court explicitly concluded that Waddell had explained the concept of the IRAA plan accurately to Neely and that he understood that dividends on the policy could increase or decrease depending on the market.[13] Findings of Fact & Conclusions of Law, 4/26/22, at 6-8 ("While the letter could have provided more detail concerning the dividends, the letter's enclosures along with Waddell's explanation of the IRAA

---

[13] Moreover, Neely's argument that Waddell did not himself understand the disclaimer language is a misstatement of the record. Waddell merely confirmed that the letter did not set forth the precise calculations of the "current scale" for projected returns, but testified that such a number would be based on the bank's evaluation of the current market conditions. N.T., 2/8/22, at 49-53. That Waddell could not perform such calculations himself off-the-cuff while testifying is not evidence that he did not understand the concept.

at the meeting, provided Neely with the relevant dividend information for the Policy."). It further held that Neely read and understood the disclaimer language. *Id.* Again, it is not our role as a reviewing court to set aside the trial court's factual findings and credibility determinations when they are supported by the record. This claim is meritless.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/30/2023